BAUER, Chief Judge.
 

 Joseph Donaldson was convicted of five counts of bank robbery in violation of 18 U.S.C. § 2113(a). He appeals his conviction, contesting a variety of the district court’s rulings, including the denial of his motions to suppress, and several of the evidentiary rulings. He also argues that count four of the indictment should have been dismissed pursuant to the Interstate Agreement on Detainers Act, 18 U.S.CApp. II, Art. IY(e), and that each of the five counts of the indictment should have been tried separately. Finally, he asserts that he did not receive effective assistance of counsel. We affirm.
 

 I.
 

 Donaldson was charged with five robberies of Chicago banks. The banks are all located within a few blocks along Michigan Avenue, and the robberies all occurred between August 2, 1988 and August 29, 1988. During the first robbery, the thief presented a handwritten demand note to Citibank teller Richard Novick which read, “Hold up. I have a gun. Give me hundreds, fifties and twenties.” Government Exhibit Citicorp 1; Trial Transcript (“Tr.”) at 38 (Testimony of Teller Richard Novick). No-vick testified that the robber seemed to be hiding a gun under his shirt. Tr. at 40. Novick handed over loose bills from his cash drawer, and the robber took the money and left.
 

 The second bank was robbed two days later on August 9,1988. The thief told the teller at Bell Federal Savings and Loan to “Hand over the money.” Tr. at 76 (Testimony of Teller Maria Moran). He indicated that he had a gun, and when the teller backed away from him, he jumped onto the counter. Then he reached into the teller’s drawer and began stuffing cash into his bag. He noticed a second teller trying to hit the alarm. He told her to quit or he would shoot her. When the thief noticed a security guard enter the behind-the-counter area, he jumped off the counter and ran out of the bank, colliding with someone outside and dropping his bag. The thief picked up the bag and ran on. Tr. at 77-78. The security guard chased the thief and ordered him to drop the money. Tr. at 95. When the robber realized the guard was gaining on him, he dropped the bag and escaped.
 
 Id.
 
 In addition to the money, the bag contained several potato chip bags and a cookie container.
 

 Citibank’s Michigan Avenue branch was robbed a second time on August 9, 1988. The thief gave Lillia Salazar, a Citibank teller, a note which warned that he had a gun and demanded money. Salazar handed over the money, and the thief escaped. On August 18, 1988, the Michigan Avenue National Bank was robbed. Teller Carrie Gro-chowski gave the robber $1,970. On August 29, this bank was robbed again.
 

 
 *384
 
 The tellers and the security guard described the robber as a black male with very short hair. The witnesses’ estimates of his height ranged from 5'8" to 5T0", though four agreed he was about 5'8". After the last robbery, Special Agent James Fredenberg of the FBI prepared a photograph spread to show the witnesses. Photograph number 2 in the spread was a Chicago Police Department photo of Donaldson that was taken in 1985. Tr. at 197. Five other photos were included in the spread. Richard Novick, Lillia Salazar, and Carrie Grochowski selected Donaldson’s photo. Maria Moran, Gregory Bohanan, and Tiffany Brzostowski (the second teller who was robbed at the Michigan Avenue National Bank) did not select any picture from the first photo spread.
 

 Because the photo of Donaldson used in the first array was three years old, Freden-berg asked the Chicago Police to look for a more recent photo. They found a picture taken August 8, 1988. Fredenberg used this photo in a second array, which he presented to the tellers beginning on August . 31, 1988. All five tellers selected Donaldson’s photo. Donaldson’s photo was the only one which appeared in both spreads.
 

 On September 1, 1988, the government filed a complaint which charged Donaldson with the August 18, 1988 robbery of the Michigan National Bank. Donaldson was arrested September 2, 1988 by Illinois authorities for a parole violation. FBI Special Agent Fredenberg obtained a warrant to search Donaldson’s sister’s apartment, where Donaldson was staying. Tr. at 278. The warrant authorized the agents .to search for robbery proceeds (currency), bank deposit slips or similar bank documents, weapons, a white plastic shopping bag, and the clothing described by the witnesses to the robberies. Although the agents found nothing in the room where Donaldson stayed, his niece directed them to a closet in her mother’s room that contained three bags the niece said belonged to Donaldson. Tr. at 280. One of these was a white bag from Sears. Two of the bags each contained a pair of sweat pants, and a third bag contained “handwriting, documents, [and] reports.” Tr. at 281. Although none of the handwritten documents contained Donaldson’s name, some of the other documents did. The agents confiscated the clothing and the documents. They found no other clothing and no money in the house. On May 16, 1989, the agents obtained handwriting exemplars from Donaldson.
 

 Prior to trial, Donaldson moved to suppress the documentary evidence seized in the apartment search. Donaldson’s motion to suppress and for severance of the five robbery counts were denied. Before trial, the district court granted the government’s motion to take (and videotape) Lillia Salazar’s deposition pursuant to Federal Rule of Criminal Procedure 15 because Salazar was pregnant, and expected to deliver around August 17, 1990. The trial was set for August 6, 1990. The trial began on schedule, and on the second day, counsel for the government told the district court that Salazar was unable to testify. She had delivered her baby the week before and was hospitalized with severe chest pain and shortness of breath on August 6. When she tried to get out of bed on August 7, she again experienced chest pain and shortness of breath. The court ruled that she was unavailable, and allowed the edited videotape to be presented to the jury. On August 9, 1990, the jury convicted Donaldson on all five counts. He was sentenced to 236 months imprisonment and five years of supervised release.
 

 II.
 

 Donaldson challenges the government’s use of the tellers’ identification testimony because he alleges it was tainted by suggestive photo spreads. His motions to suppress this testimony were denied. Both arrays included six photos of black males. The first spread was suggestive, Donaldson alleges, because he was the only person wearing a “loud, pattern shirt,” because there was a “mugshot-like” shadow in the photo, and because he had the lightest skin. Appellant’s Brief at 21. The second array was flawed, he alleges, because he was the only person “with a re
 
 *385
 
 ceding hairline and the only light-skinned black male who was not clean shaven except for mustaches.”
 
 Id.
 
 at 22. Donaldson argues that because several of the witnesses mentioned that the thief had short hair or was balding, the fact that he had the least hair of the men in the array made the array suggestive and tainted the witnesses’in-court identifications. Thus, he argues, the use of the identifications violated his due process rights under
 
 Foster v. California,
 
 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968).
 

 We apply a two-part test to determine the admissibility of challenged identification testimony. The defendant must first establish that the identification procedure was unnecessarily suggestive. If the defendant satisfies this burden, the court considers whether, viewed under the totality of the circumstances, the identification is reliable despite the suggestive procedure.
 
 Kubat v. Thieret,
 
 867 F.2d 351, 357 (7th Cir.1989), (citing
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 107-14, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977)),
 
 cert. denied sub nom., Kubat v. Greer,
 
 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989).
 
 See United States v. Johnson,
 
 859 F.2d 1289, 1294 (7th Cir.1988). The Supreme Court has explained that, “the primary evil to be avoided is a very substantial likelihood of irreparable misidentification.”
 
 Neil v. Biggers,
 
 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
 

 Reversal is warranted only if, given the totality of the circumstances, the identification testimony was unreliable.
 
 Kubat,
 
 867 F.2d at 358. To determine the reliability of the testimony, we evaluate the following factors: (1) opportunity of the witness to view the criminal at the time of the crime, (2) the witness’ degree of attention, (3) the accuracy of the witness’ prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation.
 
 Neil,
 
 409 U.S. at 199-200, 93 S.Ct. at 382-83.
 

 In
 
 Kubat,
 
 police showed five color pictures to three witnesses three-and-one-half weeks after the murder with which Kubat was charged. 867 F.2d at 356. All three witnesses were in the same bar when police interviewed them, although they were interviewed separately. Kubat’s photo was different from the others in the array: it was taken at long range, and showed him standing in a living room. The pictures of the other individuals were closeups which showed only their heads and shoulders.
 
 Id.
 
 at 356. The witnesses had described the suspect as wearing glasses, and the defendant was the only man in the array who wore them. The photo was also less clear than the other four pictures, and the reflection from his glasses obscured his face. All three witnesses selected Kubat’s photo from the first array.
 
 Id. ' m
 

 Kubat argued that the array was unduly suggestive because he was the only man wearing glasses and because of the differences in format and clarity between his photo and the others. He argued that these flaws were unnecessary because he was in custody and could have posed for a non-suggestive photo. Police presented a second photo array to one of the witnesses.
 
 Id.
 
 at 357. In this one, Kubat was not wearing glasses (another man was), but he was the only person pictured in both arrays. Moreover, each mug shot showed an arrest date on the bottom front of the picture. The witness selected Kubat’s photo. Kubat challenged the second array because he was the only one pictured in both, and because the use of the mug shot implied that he had been arrested since the police presented the previous array. He also argued that the array was unduly suggestive because his arrest date was close to the date of the murder and the other dates were long before the murder. 867 F.2d at 357.
 

 A third array was prepared three months later. This array was composed of seven black-and-white mug shots. Like the second array, Kubat was the only person whose picture also appeared in the first array, and he was not wearing glasses, although another individual wore them. This time,- however, the arrest dates were covered. One witness identified Kubat
 
 *386
 
 positively; the other also identified him, but was concerned because she had seen his photograph in the newspaper and thought she might have recognized it from the paper. Kubat also challenged this array because his photo was the only one repeated from the first array, and because mug shots were used, although the arrest dates were covered.
 
 Id.
 
 ■ Kubat argued that the cumulative effect of the three arrays was to convert “tentative initial identifications” of a man wearing glasses in a blurry photo to positive identifications with subsequent mug shot arrays. He argued that these suggestive procedures were unnecessary because he was in custody, and that the witnesses’ in-court identifications were unreliable, particularly because one witness was concerned because she saw Kubat’s photo in the newspaper.
 

 The
 
 Kubat
 
 court agreed with the defendant that the photo-array procedures were “less than optimal.”
 
 Kubat,
 
 867 F.2d at 357. In particular, the court criticized the investigative officers for interviewing witnesses in the same room, and the differences in format and clarity between Ku-bat’s photo and the other pho.tos in the first array.
 
 Id.
 
 at 357-58. The court also expressed concern about the first array because Kubat was the only person wearing glasses. Other problems the court identified included the visibility of the arrest dates in the second array, and Kubat’s solo appearance in all three arrays. Nevertheless, the court did not find that Kubat’s constitutional rights had been violated. It reviewed the arrays independently, and noted that the first photo bore little resemblance to Kubat’s mug shot. The resemblance was so slight, the court found, that “it is highly unlikely that the witnesses selected the mug shot from a memory of the first photo.” 867 F.2d at 358. The court also explained that because in the second and third arrays someone other than Kubat was wearing glasses, this indicated that the presence or absence of glasses did not effect the witnesses’ identifications. Finally, as to the arrest dates on the mug shots, the court relied upon
 
 United States v. Love,
 
 692 F.2d 1147, 1150-51 (8th Cir.1980), which held that using mug shots with arrest dates “is not necessarily -suggestive.”
 
 Kubat,
 
 867 F.2d at 358. Kubat presented no evidence that the witnesses were influenced by the dates, and the court explained that “we do not consider the mere use of a mug shot — even after the witness had initially viewed an ordinary photograph — to be unduly suggestive.”
 
 Kubat,
 
 867 F.2d at 358. Based on this analysis, the court appears to have held that the pre-trial identification procedures were not unduly suggestive. Nevertheless, the court then reviewed the
 
 Biggers
 
 factors, and determined that the admission of the identification testimony did not deny Kubat a fair trial.
 

 We do not believe that the flaws Donaldson suggests exist in the two photo arrays prepared by Agent Fredenberg rise to the level of those in
 
 Kubat,
 
 much less those outlined in the case he relies upon,
 
 Foster v. California,
 
 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968). In
 
 Foster,
 
 California authorities placed the defendant, who was wearing a jacket similar to the one worn by the robber, in a lineup with two much smaller men. When this did not produce a positive identification, police arranged for a one-on-one meeting between the witness and the defendant. Finally, police set up a second lineup; the defendant was the only person who appeared in both.
 
 Id.
 
 at 443, 89 S.Ct. at 1128-29. “This procedure” the Court found, “so undermined the reliability of the eyewitness identification as to violate due process.”
 
 Id. See also Young v. Herring,
 
 917 F.2d 858, 860 (5th Cir.1990) (discussing flawed identification procedures),
 
 vacated on other grounds,
 
 938 F.2d 543 (5th Cir.1991),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992);
 
 McFadden v. Cabana,
 
 851 F.2d 784, 785 (5th Cir.1988) (same),
 
 cert. denied,
 
 489 U.S. 1083, 109 S.Ct. 1541, 103 L.Ed.2d 845 (1989).
 

 Again, Donaldson has not established that he was subject to analogous procedures. The only similarity is the repetition of his picture in the two arrays. But as we have discussed, the pictures were taken three years apart and bear little resemblance to each other. Further, we do
 
 *387
 
 not believe the arrays used in this case were flawed. Like the court in
 
 Kubat,
 
 we have independently reviewed them, and cannot conclude the arrays were suggestive. They contained photos of men of similar age and appearance. Donaldson’s complaints about the other individuals’ skintone, hairlines, and facial hair are simply without merit. We believe it would be difficult to compile arrays that were fairer. Although in other circumstances the fact that Donaldson’s photo was the only one to appear in both arrays might be suggestive, in this case the photos were taken more than three years apart. The photo in the first array was taken in April 1985, the photo in the second array on August 8, 1988. We have examined the photos, and we agree with the government’s contention that the photos bear little resemblance to each other, and it is exceedingly unlikely that the witnesses could have relied on the first photo to select the second one. Further, all the individuals pictured in each array have very short hair and facial hair, the two characteristics stressed by the witnesses in their descriptions.
 
 See
 
 Appellant’s Brief at 13-14. Because Donaldson has not shown that the identification procedures he challenged were impermissibly suggestive, we need not reach the next question — whether a “very substantial likelihood of irreparable misidentification” existed.
 
 United States v. Johnson,
 
 859 F.2d 1289, 1294 (7th Cir.1988).
 
 Cf. Kubat,
 
 867 F.2d at 358. Thus we cannot say that Donaldson was denied a fair trial by the admission of the challenged identification testimony.
 

 Donaldson also moved to suppress the documents seized in his sister’s apartment. Agent Fredenberg obtained a warrant authorizing him to search the apartment where Donaldson was staying for: “Clothing used in the commission of the bank robberies ...; United States Currency ...; Weapons; White plastic shopping bag; Deposit or withdrawal slips and similar bank documents.” Appellant’s Appendix, Doc. 9A. Fredenberg found three bags (one of them white) of property; Donaldson’s niece told him they belonged to Donaldson. One bag contained handwritten documents, other documents, and reports. Tr. at 281 (Fre-denberg Testimony). Although the warrant did not include documents, Fredenberg seized them anyway. None of the handwritten documents bore Donaldson’s name, although some of the others did. Donaldson contends that the seizure of the documents. was unconstitutional because they were not included in the warrant and because Fredenberg did not have probable cause to justify their seizure under the plain view doctrine. In its response to his motion to suppress, the government states:
 

 The agents found the papers in question while they were searching for items listed in the search warrant. The papers were in plain view and, given where they were found, evidently belonged to Donaldson. Furthermore, the agents reasonably believed the papers were incriminating; the robber in two of the bank robberies at issue used handwritten demand notes, and the papers that were seized contained handwriting, apparently belonging to Donaldson, that could be used to make an identification.
 

 R. Doc. 88, at 4-5. There are no affidavits attached to the response, and no suppression hearing was held.
 

 The government took handwriting exemplars from Donaldson on May 16, 1989. The exemplars were admitted at trial without objection. Tr. at 290. The government’s expert testified that Donaldson “probably” wrote the robbery notes, but would not say that the evidence that he did so was “conclusive”. Tr. at 372-3. The expert qualified his opinion because the amount of writing in the robbery notes was limited, and because the requested exemplars did not represent Donaldson’s everyday handwriting — there was evidence that he deliberately disguised his writing. Tr. at 287-88, 373.
 

 We will not overturn a trial court’s denial of a motion to suppress unless it is clearly erroneous.
 
 United States v. Henry,
 
 933 F.2d 553, 556 (7th Cir.1991), (citing
 
 United States v. McNeese,
 
 901 F.2d 585, 592 (7th Cir.1990)),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 1703, 118 L.Ed.2d 412 (1992). In this case our review is compli
 
 *388
 
 cated by the lack of a written opinion from the district court on the denial, indeed of any formal record of the denial at all. In his briefs, Donaldson refers to his motion to suppress, but not to the court’s order. The government also fails to cite the order. We have found two one-sentence orders denying motions to suppress.
 
 See
 
 R. Docs. 23 and 68. Record Document 23, an order entered February 9, 1990, states only: “Pending motion to suppress is treated as denied by the court.” Although we are not sure, this order seems to refer to Donaldson’s motion to suppress the identification testimony.
 
 See
 
 R. Doc. 20 (Order of December 12, 1989 regarding pending motion to suppress identification, setting status hearing for January 30, 1990, which in turn was- continued until February 9, 1990). Indeed, our review of the district court docket sheet indicates that , only the motion to suppress the identification testimony was pending at the time of the first order. This leaves the second one, Record Document 68, entered July 19, 1990, which states “Defendant’s pro se motion to suppress is denied.” Again this order seems to refer to Donaldson’s renewed motion to suppress the identification testimony.
 
 See
 
 R. Doc. 56. Donaldson’s pro se “Motion for Return of Seized Property and Suppression of Evidence Illegally Seized,” was not docketed until August 3, 1990 (just days before trial). There is no record of any ruling on this motion in the docket sheet or the pleadings files submitted in the record on appeal. The government responded to the motion, together with other motions on August 6, 1990, the first day of trial. R. Doc. 88. In a footnote in that response, citing Federal Rule of Criminal Procedure 12(f), the government contended that the defendant’s late filing waived the issues presented in his motion. R. Doc. 88, at 1 n. 1. We-have also reviewed transcripts of -the pretrial hearing held August 2, 1990 and of the hearing held on August 6, 1990 before the first day of trial began. We have found only one reference to Donaldson’s motion to suppress the seized documents. On the morning of trial, the court stated that
 

 I have ruled about these additional pretrial motions as to their timeliness. And I might also indicate that I have read the things substantively, and there doesn’t seem to be anything in there that you wouldn’t handle by way of foundation or on the admissibility of evidence. Or very little, in any event. So we’ll deal with it in that manner.
 

 Tr. at 7. This appears to be the extent of the court’s ruling. The most obvious interpretation is that the trial court denied Donaldson’s motion as untimely. Nevertheless, the government has not renewed the waiver argument here, and has chosen to defend Donaldson’s Fourth Amendment claim on the merits. Thus, the government has waived waiver.
 
 See, e.g., United States v. Leichtnam,
 
 948 F.2d 370, 375 (7th Cir.1991) (government’s failure to raise argument in its brief or oral argument that defendant waived argument resulted in waiver of waiver);
 
 Fagan v. Washington,
 
 942 F.2d 1155, 1157 (7th Cir.1991) (discussing government’s waiver of waiver in habe-as action). The government’s waiver is compounded by the lack of a more complete ruling by the district court on Donaldson^ motion.
 
 [1]
 

 We are left then with the admission of the handwritten documents which Donaldson contends were seized in violation of his Fourth Amendment rights. The documents were not listed in the search warrant,, although there appears to be no contention that they were not in plain view within the apartment. Appellee’s Brief at 18. In its response to Donaldson’s motion to suppress, the government contended that its agents believed the documents were incriminating because they knew-handwritten notes were used in the robberies. The district court did not consider this
 
 *389
 
 contention, and it is difficult for us to evaluate such a fact-based claim for the first time on appeal. Even if we assume, however, that the documents should not have been seized or admitted, we believe their admission in this case constitutes harmless error because of the government obtained handwriting exemplars from Donaldson while he was in custody.
 

 “A conviction tainted by constitutional error must be reversed unless the error is harmless.”
 
 United States v. Pavelski,
 
 789 F.2d 485, 490 (7th Cir. 1986),
 
 cert. denied,
 
 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986). “In order to find an error of constitutional magnitude harmless the reviewing court ‘must be able to declare a belief that it was harmless beyond a reasonable doubt.’ ”
 
 Id.
 
 (quoting
 
 Harrison v. Owen,
 
 682 F.2d 138, 140 (7th Cir. 1982)). To make this determination, we must decide that “ ‘the minds of an average jury’ would not have found the State’s case significantly less persuasive had the inadmissible evidence been excluded.”
 
 Pavelski,
 
 789 F.2d at 490 (quoting
 
 Harrison,
 
 682 F.2d at 141).
 

 The handwriting exemplars Donaldson provided were relied upon by the government’s expert and were the basis of his qualified opinion that Donaldson wrote the notes. Tr. 372-73. Based on our review of the record, and all the incriminating evidence properly seized and admitted (including Donaldson’s fingerprints on one of the robbery notes and the live testimony of five eyewitnesses — Novick, Moran, Bohanan, Grochowski, Brzostowski), we conclude the admission of the documents was harmless beyond a reasonable doubt.
 
 Cf. United States v. Hill,
 
 898 F.2d 72 (7th Cir.1990) (erroneous admission not harmless where government’s case is largely circumstantial).
 

 Next, Donaldson contends that the district court should have granted his motion to dismiss count four of the indictment because more than 120 days elapsed between the time the federal government filed a detainer with state authorities and the time of his trial. Again neither party refers us to the judge’s order on the matter, other than simply stating that the motion was denied. In fact, the motion is not even referenced. We have found four motions to dismiss on speedy trial grounds, three of them pro se.
 
 See
 
 R. Docs. 27, 32, 43, and 60. We have found two orders denying these motions, R. Doc. 53 entered May 17, 1990, and R. Doc. 84 entered August 2, 1990. The orders state simply: “Defendant’s motion to dismiss regarding speedy trial undue delay is denied,” and “Motion to dismiss indictment is denied.”
 

 Federal and state warrants against Donaldson for the August 18, 1988 robbery of the Michigan National Bank were issued September 1, 1988. Donaldson was arrested by state police September 2, 1988 for parole violations. The government lodged a detainer against Donaldson on November 22, 1988, and Donaldson filed a motion for a prompt trial on December 1, 1988. On February 16, 1989, the government’s original complaint was dismissed without prejudice and the detainer was withdrawn. Donaldson contends that state authorities were not notified of the withdrawal of the detainer. Appellant's Brief at 27.
 

 The government contends that it did notify state authorities. Appellee’s Brief at 23. We find no record evidence of either assertion. The government filed another complaint against Donaldson in September 1989, charging him with the August 9,1988 robbery of Bell Federal Savings. Donaldson was arrested on October 12, 1989 pursuant to the federal warrant issued with the September 1989 complaint. On October 31, 1989, Donaldson was indicted by a grand jury on five counts of bank robbery. On appeal, he asks us to dismiss count four, which was based on the August 18, 1988 robbery, because it was the subject of the federal detainer lodged with state authorities.
 

 Donaldson misapprehends the protection afforded by the Interstate Agreement on Detainers Act, 18 U.S.C. Appendix II (1985). The Act “is designed ‘to encourage the expeditious and orderly disposition of charges outstanding against a prisoner and determination of the proper status of any and all detainers based on untried in
 
 *390
 
 dictments, informations or complaints.’ ”
 
 United States v. Mauro,
 
 436 U.S. 340, 343, 98 S.Ct. 1834, 1839, 56 L.Ed.2d 329 (1977) (quoting Article I of the Act, 18 U.S.C.App., pp. 585-592 (1985 ed.);
 
 United States v. Reed,
 
 620 F.2d 709 (9th Cir.),
 
 cert. denied,
 
 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980)). The Act allows prisoners to demand the speedy disposition of charges pending against them in other jurisdictions, and serves “to prevent prosecutorial abuses of the detainer that potentially allow a prisoner to languish in a separate jurisdiction under the constant but uncertain threat of further prosecution.”
 
 United States v. Kurt,
 
 945 F.2d 248, 251 (9th Cir.1991).
 

 The Act’s protection does not extend to Donaldson, however, because he was not held by state authorities subject to a federal detainer for more than 180 days after he requested a speedy disposition of the federal charges. The withdrawal of the detainer removed Donaldson from the purview of the Act. The Act prevents detainers from remaining lodged with no action being taken on them for long periods.
 
 See Mauro,
 
 436 U.S. at 360, 98 S.Ct. at 1847. Here, the charges were resolved by dismissal of the complaint within 180 days of Donaldson’s speedy trial motion. (The motion was filed December 1, 1988, the complaint was dismissed and the detainer withdrawn on February 16, 1989). In the only case we have found which considers this issue, the Second Circuit stated that “The government cannot lodge a detainer against the defendant and then throw out the clock every time it dismisses charges, only to start the clock anew by bringing a new set of charges.”
 
 United States v. Cephas,
 
 937 F.2d 816, 821 (2d Cir.1991),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). But in
 
 Cephas,
 
 we believe the court was concerned with a different problem than the one presented here. In
 
 Cephas,
 
 the government dismissed its charges two days after the defendant filed a speedy trial motion, but did not inform the defendant. Then it filed an indictment based on the same conduct two months later, and had the defendant brought before the district court pursuant to a writ of habeas corpus
 
 ad prosequendum.
 
 On appeal, the defendant argued that the government cannot benefit from the dismissal of the charges underlying the detainer if it never notifies the defendant that it has dismissed the charges or if it never does anything to withdraw the detainer. The Second Circuit agreed.
 
 Cephas,
 
 937 F.2d at 820-21.
 

 In this case, however, the government withdrew the detainer and notified Donaldson of its withdrawal. Although he contends in his brief that the state authorities were never notified of the withdrawal of the detainer (Appellant’s Brief at 27), in his motions below, he contended that although the state authorities were notified, they continued to treat him as if the detainer was still lodged.
 
 See
 
 R. Doc. 49 at 2-3 (Donaldson Letter to be filed in the record, docketed May 22, 1990) and R. Docs. 51, at 6 n. 5 (Government’s responses to Donaldson’s letter and motions) (“Donaldson appears to argue that the state prison officials continued to treat him as if the detain-er were still lodged even after it was removed.”). The remedy for this behavior by state authorities is not dismissal of subsequent federal charges.
 

 In
 
 United States v. Reed,
 
 620 F.2d 709, 711 (9th Cir.),
 
 cert. denied,
 
 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980), the court held that a notation by a state official to hold a prisoner for U.S. Marshals did not constitute a detainer subject to the provisions of the Act. Similarly, in
 
 United States v. Weaver,
 
 882 F.2d 1128, 1132-33 (7th Cir.),
 
 cert. denied sub nom., Schmanke v. United States,
 
 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989), the defendant alleged that his privileges were curtailed because a detainer was lodged against him. The government showed that no detainer was filed. Because the defendant could not show that the curtailment of his privileges was caused by a detainer, the provisions of the Act did not apply. Although these cases are not directly on point, we believe they show that a necessary prerequisite to the operation of the Act is that a detainer is actually lodged by the charging jurisdiction with the jurisdic
 
 *391
 
 tion holding the prisoner. Because the government withdrew its detainer against ■ Donaldson and notified him of the withdrawal, the provisions of the Act no longer applied to him.
 

 Donaldson also contends that the district court erred in denying his motion for severance of the five robbery counts pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Before we can examine whether the counts should have been severed, we must determine whether they were properly joined. Rule 8(a) provides that
 

 [t]wo or more offenses may be charged in the same indictment or information ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting part of a common scheme or plan.
 

 Whether joinder is proper is a question of law which we review
 
 de novo. United States v. L’Allier,
 
 838 F.2d 234 (7th Cir. 1988) (citing
 
 United States v. Shue,
 
 766 F.2d 1122, 1134 (7th Cir.1985)). Joinder of the five robbery counts was proper because the requirements of 8(a) were satisfied. Offenses may be joined if they occur within a relatively short period of time, and the evidence of the several counts overlaps.
 
 United States v. Shue,
 
 766 F.2d 1122, 1134 (7th Cir.1985),
 
 cert. denied,
 
 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987). Here, within a four-week period, two banks were each robbed twice, two banks were robbed on the same day, and all the banks were within a few blocks of each other. The handwriting evidence for two of the counts overlapped, and the five eye-witnesses all described a similar robber. Further, we held in
 
 United States v. Archer,
 
 843 F.2d 1019, 1021 (7th Cir.),
 
 cert. denied,
 
 488 U.S. 837, 109 S.Ct. 100, 102 L.Ed.2d 76 (1988), that where the crimes are the same or of similar character and the elements to be proved in each count are the same, these similarities permit the joinder of the offenses. Here, the elements to be proved for each bank robbery count were precisely the same, providing further support for the joinder of the offenses.
 

 Once we determine that joinder was proper, we review a district court’s denial of a severance motion for an abuse of discretion.
 
 United States v. Moya-Gomez,
 
 860 F.2d 706, 754 (7th Cir.1988),
 
 cert. denied sub nom., Estevez v. United States,
 
 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).
 
 See also United States v. Bolzano,
 
 916 F.2d 1273 (7th Cir.1990). In order to determine whether severance is appropriate, a trial court is to balance the cost of conducting separate trials against the possible prejudice inherent in a single trial.
 
 Moya-Gomez,
 
 860 F.2d at 754. This inquiry is most appropriately conducted by the district court, and consequently a defendant on appeal “bears an extremely difficult burden of showing ... that the district court abused its discretion.”
 
 Id.
 
 A defendant must show that he was actually prejudiced by the denial. We have explained that a defendant must establish “not merely that a separate trial would offer him a better chance of acquittal,” but that he could not have a fair trial without severance.
 
 Id.
 
 (quoting
 
 United States v. Peters,
 
 791 F.2d 1270, 1301 (7th Cir.),
 
 cert. denied sub nom., Estevez v. Peters,
 
 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986)).
 

 Donaldson contends that the jury could have confused the evidence from each of the five robberies, or might have inferred improperly from a conviction on one count that he had a “criminal disposition,” and, therefore, that he committed the other robberies. Donaldson’s claim is analogous to the defendant’s claim in
 
 United States v. L’Allier,
 
 838 F.2d 234 (7th Cir. 1988). L’Allier was charged with two robberies of the same bank which occurred approximately six months apart. Like Donaldson, he argued that the jury was confused by the joinder and unable to separate the evidence relevant to each robbery. He argued that because the evidence that he committed the second robbery was much stronger, he would not have been convicted of the first one had the charges been severed.
 
 Id.
 
 at 241. Nevertheless, we held
 
 *392
 
 that L’Allier could not show, actual prejudice because the trial was short (the opinion does not indicate how short), the evidence was not complex, and “the chronological nature of the evidence made it relatively simple for the jury to relate the evidence to the proper count.”
 
 L’Allier,
 
 838 F.2d at 241.
 

 We believe the same factors in this case belie Donaldson’s claim that the jury was confused by the trial of the five bank robbery counts together. The trial was only four days. The evidence was not complicated and was presented chronologically. Although it may be more difficult for a jury to keep five robberies straight than two, we do not believe the number of crimes overly complicated the jury’s ability to consider the evidence appropriate to each count.
 

 Whether the specter posed by the forbidden “criminal disposition” inference is large enough to require severance in this case is a closer question. Nevertheless, we do not believe- that any prejudice engendered by the joinder of the offenses deprived Donaldson of a fair trial. The government presented ample evidence of guilt: five eyewitnesses (one for each robbery) testified, and identified Donaldson; his fingerprints were found on one of the notes, and an expert identified his handwriting. We believe that this is sufficient to allay any concerns about possible prejudice to Donaldson. Moreover, the jury was instructed not to consider its verdict on one count in its decision on. other counts. R. Doc. 103 (jury instructions). “Our theory of trial relies upon the ability of a jury to follow instructions.”
 
 L’Allier,
 
 838 F.2d at 242 (quoting
 
 United States v. Percival,
 
 756 F.2d 600, 610 (7th Cir.1985)). Like the court in
 
 L’Allier,
 
 we believe the jury was able to follow the district court’s limiting instructions. For these reasons, we hold that the district court did not abuse its discretion in denying Donaldson’s motion for severance.
 

 Donaldson next challenges the district court’s determination that Lillia Salazar, one of the bank tellers, was unavailable to testify at trial, and its resulting admission of her videotaped deposition. Donaldson asserts that the presentation of Salazar’s videotaped deposition violated his Sixth Amendment right to confront the witnesses against him. Federal Rule of Criminal Procedure 15 provides for the taking of witness depositions in the presence of the defendant whenever due to exceptional circumstances it is in the interest of justice. The deposition testimony may be presented at trial if the witness is unavailable, as unavailability is defined by Federal Rule of Evidence 804(a).
 

 The trial judge determined that Salazar was unavailable. As we discussed in the fact section above, Salazar had delivered a child shortly before trial and was seriously ill at the time of trial. Rule 804(a)(4) defines unavailability as an inability to testify because of “then existing physical or mental illness or infirmity.” “The determination of admissibility of deposition testimony based on unavailability is a matter left to the discretion of trial judge.”
 
 United States v. Campbell,
 
 845 F.2d 1374, 1378 (6th Cir.1988),
 
 cert. denied,
 
 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988);
 
 United States v. Faison,
 
 679 F.2d 292, 295 (3d Cir.1982). Donaldson does not contest the reliability of Salazar’s videotaped deposition; instead he argues that the district court erred as a matter of law in determining Salazar was not available for trial. He argues that the Sixth Amendment’s preference for live testimony required the trial court to postpone the trial or to attempt to call Salazar on another day.
 

 We disagree. The Sixth Amendment does reflect the framers’ marked “preference for face-to-face confrontation of witness and accused in the criminal trial.”
 
 Sahagian v. Murphy,
 
 871 F.2d 714, 715 (7th Cir.1989). Thus it requires the government “to demonstrate the unavailability of[ ] the declarant whose statement it wishes to use against the defendant.”
 
 Ohio v. Roberts,
 
 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980) (quoted in
 
 Sahagian,
 
 871 F.2d at 715.). Once the court determines a witness is unavailable, it also must be satisfied that the prior recorded testimony “is marked with such
 
 *393
 
 trustworthiness that ‘there is no material departure from the reason of the general rule.'”
 
 Sahagian,
 
 871 F.2d at 715 (quoting
 
 Snyder v. Massachusetts,
 
 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)).
 

 First, we reemphasize that the determination that Salazar was unavailable falls within the discretion of the district court. We see no abuse of that discretion on these facts — Salazar had recently delivered a child, had been hospitalized the day before she was to testify with chest pain, and experienced chest pain again when she attempted to rise from her bed the day of her scheduled testimony. Tr. at 111. At trial, Donaldson asked the court to sever the count on which Salazar was to testify, and hold a second trial later. On appeal he asks that we reverse his conviction on that count and remand for a new trial. But, as the Third Circuit explained in
 
 United States v. Faison,
 
 679 F.2d 292, 297 n. 3 (3d Cir.1982), “[t]he public ... has an interest in speedy justice. [The defendant’s agreement to waive any speedy trial claims while a significant factor in the exercise of discretion, is not dispositive.”
 
 Faison
 
 evaluated the availability of a witness in the context of the Sixth Amendment’s speedy trial provision.
 

 The Third Circuit emphasized that “since witness availability affects the court’s ability to manage its cases, the trial court’s decision to refuse an adjournment and to admit prior testimony must be treated with respectful deference.”
 
 Id.
 
 at 297. At the hearing on Salazar’s availability, the district court noted that the problem with Salazar's health was not unexpected, and that her condition was uncertain. Moreover, he expressed concern about the availability of trial time for a second trial, in which he found it likely that the evidence of the other robberies would be admissible. He emphasized that Donaldson and his counsel had participated fully during the video-taped deposition because of the possibility that Salazar would be unable to testify at trial. Tr. at 112. He also noted that the video allowed the jury to observe Salazar’s manner and demeanor, in much the same way as if she had testified at trial. Further the court found that Salazar’s testimony and cross examination “were rather carbon copies of two or three other wit-nesses____” Tr. at 113. Based on these factors, and the seriousness of Salazar’s health problems, the court determined that the government had shown that Salazar was unavailable and the videotape should be admitted.
 

 Donaldson cites
 
 Bums v. Clusen,
 
 798 F.2d 931 (7th Cir.1986) to support his claim that the use of the Salazar videotape violated his Sixth Amendment rights. In
 
 Burns,
 
 the state trial court found a witness was unavailable based on a physician’s testimony at a hearing held two months after the physician’s last contact with the witness.
 
 Id.
 
 at 935. The trial court also refused to reconsider its ruling when the trial began some three months after that. Because the defendant had not introduced professional testimony to show the witness had recovered, the trial court refused to reconsider the ruling and admitted the witness’s preliminary hearing testimony.
 
 Id.
 
 at 936. We found that the trial court erred (although harmlessly) in basing its ruling on stale information, and by requiring the defendant to show that the witness was available. We stressed that the government was required to make “stringent efforts to show that [the witness] was unavail-able____”
 
 Id.
 
 at 942.
 

 But the infirmities present in
 
 Burns
 
 are not present in the case at bar. The court held a hearing the day Salazar was to testify to determine her availability, so it did not rely on stale information. Further, the government at all times shouldered the burden of showing Salazar’s unavailability. We also note that Donaldson’s counsel vigorously cross-examined Salazar during her deposition, challenging her identification of Donaldson and her memory of the robbery.
 
 See
 
 Tr. of Salazar Deposition, taken July 25, 1990, Supp.Ree. Pleadings Volume. We cannot find an abuse of discretion in the court’s determination that a woman who had delivered a child a week prior to trial and had been hospitalized the day before with chest pain was unavailable for a four-day trial. For holdings illustrating the breadth of a district court’s discretion,
 
 see,
 
 
 *394
 

 e.g., United States v. Roller,
 
 956 F.2d 1408, 1415 (7th Cir.1992) (affirming holding that key witness was unavailable for five months after triple-bypass open-heart surgery);
 
 United States v. Campbell,
 
 845 F.2d 1374, 1378 (6th Cir.1988) (affirming holding that elderly witnesses were permanently unavailable).
 

 Finally, and perhaps inevitably, Donaldson challenges the adequacy of his counsel below. Whether this issue is open on direct appeal is a subject on which panels of this court have reached different conclusions. Compare, e.g.,
 
 United States v. Nero,
 
 733 F.2d 1197, 1207 (7th Cir.1984) (“[T]he issue of ineffectiveness of counsel, if not presented before the district court, will not be addressed on appeal.”), with, e.g.,
 
 United States v. Taglia,
 
 922 F.2d 413, 417-18 (7th Cir.1991) (defendant must present claim of ineffective assistance on appeal, for if record supports that contention any delay waives the contention). Last December this court heard
 
 United States v. Echols
 
 en banc to settle on one approach for the circuit. At oral argument of
 
 Echols,
 
 however, appellate counsel withdrew his contention that trial counsel had been ineffective, and the case was thereafter returned to the panel for decision on other grounds. 951 F.2d 352 (7th Cir.1992) (table). Since then, another panel has come down on the side of
 
 Taglia, see United States v. Castillo,
 
 965 F.2d 238, 243 (7th Cir.1992), but the conflict among panels remains. The prosecutor has not asked us to resolve it here — has not, indeed, recognized that there is a problem. The government having waived this point, we consider defendant’s argument.
 

 Donaldson had three appointed attorneys below, and has á fourth on appeal. He contends that his trial counsel’s (he was represented by a single attorney throughout trial) failure to call two witnesses he deems “key” to his defense rendered his performance constitutionally infirm. The first witness, Donaldson’s brother Nathaniel Ivery, would have testified that Donaldson received an inheritance around the time of the robberies. This, Donaldson contends, would have explained why he possessed a large amount of cash during August 1988. Appellant’s Brief at 43. The second witness Donaldson alleges should have been called was Karen Todd. Donaldson does not identify her in his brief, but he asserts that she would testify that the thief who robbed Citibank on August 9, 1988 did not look like the thief who robbed the bank on August 2, 1988. Donaldson also complains that his trial counsel failed to investigate or hire an expert to determine whether the videotapes taken by the bank security cameras were altered to delete exculpatory evidence. Neither party sought to introduce the tapes at trial.
 

 The Sixth Amendment bestows upon criminal defendants the right to effective counsel.
 
 Harris v. Reed,
 
 894 F.2d 871, 877 (7th Cir.1990). Nevertheless, a defendant bears a heavy burden when attempting to establish that his counsel was ineffective.
 
 Sullivan v. Fairman,
 
 819 F.2d 1382, 1390 (7th Cir.1987). He must show (1) that his attorney’s representation fell below an objective standard of reasonableness, and (2) that there exists a reasonable probability that, but for counsel's ineffectiveness, the result of the proceedings would have been different.
 
 Strickland v. Washington,
 
 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984);
 
 United States v. Moya-Gomez,
 
 860 F.2d 706, 763 (7th Cir.1988).
 
 See also Harris v. Reed,
 
 894 F.2d 871, 877 (7th Cir.1990) (“The benchmark for judging a claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.”).
 

 The defendant must identify specific failures in counsel’s performance which form the basis of his claim. The court “must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.”
 
 Strickland,
 
 466 U.S. at 690, 104 S.Ct. at 2066. In
 
 Harris,
 
 we warned of the danger of “Monday morning quarterback [mg], ’ ’ and explained that counsel’s “objectively reasonable strategic decisions ... are virtually unchallengeable.” 894 F.2d at 877.
 

 
 *395
 
 We have reviewed the circumstances surrounding counsel’s alleged failures and find that Donaldson’s ineffective assistance claim is meritless. Donaldson complains about his counsel’s failure to retain an expert to examine the bank security videotapes. The government did not try to introduce the tapes at trial, and thus evidence that the tapes might have been altered would not have affected the outcome of the trial. We have examined Donaldson’s filings on this question — in particular his letter filed on July 23, 1990. R. Doc. 73. In that letter, Donaldson discusses at length his belief that his image had been placed into one or more of the tapes, but mentions no exculpatory evidence contained in the tapes. Further, in an affidavit filed as part of a motion to suppress (R. Doc. 71) Donaldson complains that the videotapes were not clear enough to identify the alleged robber. This perhaps explains why the government did not seek to admit the tapes, and counsel did not pursue an expert evaluation of them. Regardless, we find that counsel’s failure to obtain expert examination of evidence not submitted at trial does not fall below the standard of reasonable professional conduct required by
 
 Strickland.
 

 We reach the same conclusion as to counsel’s failure to call Ivery and Todd. Based on our review of the record, it seems clear that the thrust of the government’s case was the eyewitness testimony and the handwriting evidence inquiry Donaldson to the demand notes. Donaldson’s counsel strongly contested that evidence, during both cross-examination and closing arguments. Given the live testimony of five other eyewitnesses, counsel’s failure to call a witness who questioned the identity of the robber in the second Citibank robbery does not undermine our confidence that the jury reached a just result. Similarly, that Donaldson possessed a lot of cash during August 1988 and the corresponding inference pressed by the government that the cash came from the robberies, were only minor elements in the government’s case. Counsel contested the veracity of the testimony about the cash Donaldson possessed (Tr. at 511-12), and argued that Donaldson might have received the money from jobs. Tr. at 500. We believe counsel's decision to focus on inconsistencies in the testimony about the cash and his able closing argument fall within the standards of professional conduct required by
 
 Strickland.
 

 This was not a “close" case in terms of the weight of evidence the government mustered against the defendant. Donaldson was not prejudiced by counsel’s decisions. Any possible doubts on this score are allayed by the district court’s commendation of counsel’s representation of Donaldson. Tr. at 241 (“And by the way, whatever problems that exist between you and Mr. Donaldson, I will tell you, for whatever it is worth, between you and me, you are doing one hell of a job for him.”). Based on our review of the record, we see no grounds to question the district court’s assessment. Thus, we conclude that Donaldson’s ineffective assistance claim is without merit.
 

 For the foregoing reasons, the judgment of the district court is
 

 Affirmed.
 

 [1]
 

 . The omission is perhaps understandable in this case. Donaldson filed many handwritten pro se motions and had three different attorneys during the proceedings below. The district court held several lengthy hearings on these motions during which Donaldson was present and permitted, indeed encouraged, to participate fully.
 
 See
 
 Tr. of Hearing of January 30, 1990, Supplemental Record (“Supp.Rec.”) Vol. 2 of 5; Tr. of Hearing held May 17, 1990, Supp. Rec. Vol. 4 of 5. This motion to suppress was filed just a few days before trial.