# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-1066

LAWRENCE GREGORY-BEY,

*Petitioner-Appellant,*

*v.*

CRAIG A. HANKS,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 94-C-903—**David F. Hamilton**, *Judge.*

ARGUED FEBRUARY 13, 2002—DECIDED JUNE 13, 2003

Before COFFEY, MANION, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* In November 1985, two men robbed a McDonald's restaurant in Indianapolis, Indiana. During the course of the robbery, the men locked five of the employees in the freezer of the restaurant and proceeded to murder the manager. Three months after the crime, four of the five surviving employees identified Lawrence Gregory-Bey ("Gregory-Bey") as one of the perpetrators of the crime. After a Marion County, Indiana jury convicted Gregory-Bey of murder, robbery, criminal confinement, and a host of other offenses associated with the McDonald's crime, Gregory-Bey's direct appeal languished in the Indiana state court system for nearly ten years before it was finally resolved. While Gregory-Bey

waited for the state court system to resolve his direct appeal, he filed a petition for habeas corpus relief in the Southern District of Indiana, which we allowed to proceed in spite of the procedural requirement that he exhaust his state remedies, due to the inordinate delay and malfunctioning of the Indiana state court system, through no fault of the defendant. The federal district court for the Southern District of Indiana denied Gregory-Bey's petition, and he appeals. We affirm.

## I.  Factual Background

### A.

The two robbers entered the Indianapolis McDonald's restaurant shortly after 7 a.m. on November 17, 1985. After drinking some coffee and remaining on the premises until all the other customers in the restaurant departed, the two men brandished handguns, announced themselves as robbers, and ordered the five employees (Angela Grinter, Urhonda Graham, Patrice Hampton, Kathryn Blakely, and Sonia Meads) and the assistant manager (DeWayne Bible) to the back of the store. The robbery itself lasted about five to ten minutes and netted the men slightly over $1,000. The robbers, not satisfied with their illicit proceeds, forced all but one of the employees into the freezer room, while keeping one as a hostage. In an act of bravery, Bible asked the criminals to take him as their hostage rather than his employee, and they did so, locking the other five employees in the restaurant's freezer. Approximately five minutes later, the employees in the freezer heard two or three gunshots. After waiting several minutes and when the employees were no longer able to hear the voices of the robbers, believing that they had departed, the employees kicked the locked freezer door open. Upon exiting the freezer, they discovered Bible's body, lying on the floor in a pool of blood with two closely

spaced gunshot wounds at the base of his head (execution style).

Shortly thereafter, the police arrived and they separated the witnesses and proceeded to tape record statements from each of them concerning the details of the crime, including their respective descriptions of the criminals. The victims estimated that over the course of the robbery, they had five to ten minutes to view the faces of the robbers. Their descriptions of the robbers' features were relatively consistent, varying only in the amount of detail provided. They described one of the suspects (whom they later identified as Gregory-Bey) as a dark-skinned African American male, between 5'10" and 6'1" in height, with a slight build (125-130 pounds), uncombed or matted Afro, a small amount of facial hair or thin beard, and pock-marks or acne scars on his face.

After providing the police with descriptions of the two robbers, three of the witnesses—Grinter, Graham, and Hampton—met collectively with a police artist and provided a description that was subsequently used in the creation of composite sketches of the two robbers. Police placed copies of these sketches in the vicinity of the crime scene, resulting in the police receiving several tips.

In the weeks following the robbery, the police received information that Gregory-Bey might have been involved in the McDonald's robbery and Bible's murder. Accordingly, the police produced a black-and-white photograph of Gregory-Bey from the Indianapolis Police Department and placed it among a set of at least a half dozen other black and white photographs of black men, which they displayed to the victims in hopes of getting a positive identification of the robbers. (R. at 406.) The record is clear that these photos were of poor quality and that no witness was able to positively identify the suspect from the photo display. (R. at 472-73, 543, 577-78, 612-13, 636-37.)

The police department refused to terminate their investigative efforts just because of the lack of an identification from the admitted poor quality of the initial photos presented. Detective Fred Jackson next secured a (color) photo of Gregory-Bey from the police department's photo lab. This photo (marked as State Exhibit 3A, and included in the record before us on appeal), while apparently more clear than the original photo, still did not reveal the subject's features in detail sufficient for any of the witnesses to make a positive identification of the suspect, as the face is largely shadowed. Two months after the crime, Jackson displayed this photo, within a stack of twenty-seven other color photos, to witnesses Blakely, Graham, Grinter, and Hampton individually. All four testified that although they felt the man pictured "looked like" one of the robbers, they still couldn't be sure because the picture wasn't clear. (R. at 414, 425-26, 544, 581, 593-94, 616-17, 640-41, 1057, 1163.)[1]

Detective Elmer Combs was also in possession of another (color) photo of Gregory-Bey (marked as State Exhibit 4, and included in the record before us on appeal), but this photo was much clearer than the one Jackson had. The face in Combs' photo is clearly visible, and the defendant's features (acne, facial hair, hair style) are clearly distinguishable. Shortly thereafter, he displayed this different picture of Gregory-Bey in another photo array with five other pictures to the victim-witnesses. When the witnesses were shown this markedly different photo

---

[1] The record does not support the dissent's conclusion that Blakely's identification was tainted by the fact she was apparently growing tired of Sergeant Jackson's frequent visits with her. *Post* at 9. It is clear from the record that the two color pictures of Gregory-Bey that Blakely was shown differed significantly from each other, and that the poor quality of the first picture prevented her from making a certain identification.

individually, their reactions were decisive and swift. Within "seconds," each of the four witnesses—Blakely, Graham, Grinter, and Hampton—individually and positively identified Gregory-Bey as one of the robbers. (R. at 436, 438, 440, 544-46, 592, 614-16, 640.)[2] The witnesses' identifications were made independently of each other, and without any assistance or suggestions from the detectives.[3] Blakely and Graham even began to "shake" when seeing a clear picture of the face of the perpetrator.[4] Thus, the record reflects that four of the five surviving victims individually selected Gregory-Bey's photograph from the six-picture photo spread.

---

[2]  The final witness, Meads, was unable to make an identification.

[3]  The dissent points to testimony by one witness—Grinter—that Sergeant Jackson supposedly told her before she viewed the photos that another witness had positively identified a suspect from within the same set she was about to examine. She later stated that she wasn't sure whether Jackson's alleged comment was made before *or after* he displayed the pictures to her. (R. at 1035.) The dissent also cites *United States v. Smith*, 156 F.3d 1046, 1050 (10th Cir. 1998), for the proposition that it is "unduly suggestive for police to tell witnesses to assume the suspect was in the photo array." *Post* at 6. The *Smith* case does not stand for so broad a principle. While not condoning the practice of "stating or implying" that witnesses had chosen the "correct" photo, the court found that statements of this nature did *not* rise to the level of "coaching" a witness. *Id.* at 1050.

[4]  After Detective Combs told Sergeant Fred Jackson, who had previously shown Blakely photographs of suspects, that Blakely had identified Gregory-Bey as one of the robbers, Jackson was skeptical of Blakely's identification. But when Combs showed him the color photograph that Blakely had identified, Jackson made clear that it was "completely different from" the photograph that he (Jackson) had presented to Blakely (the one from which she was not able to make a positive identification).

Based upon these positive identifications recounted above (from four out of the five surviving victim witnesses), the police arrested and took Gregory-Bey into custody on March 2, 1986, and the following day arranged for a physical identification lineup of six men, enacted in the presence of Gregory-Bey's counsel. Before viewing the lineup, the police instructed the witnesses about certain guidelines for the lineup procedures. Specifically, the police stated to the witnesses that the suspect "may or may not be in the line-up" and also that they were "not to talk to each other about anything."[5]

The witnesses viewed the lineup in two separate groups. First, Blakely, Grinter, and Graham viewed the lineup and were given a numbered form to mark if they were able to identify the suspect (each person in the lineup had a number). Blakely *immediately* picked Gregory-Bey out of the lineup and marked her form accordingly.[6] Blakely later stated at her deposition that as she did so, she

---

[5] Detective Combs delivered the instruction to the witnesses. Curiously, the defendant's attorney asked no further questions of the detectives about the specificity or scope of the instruction. The record is not sufficiently clear to allow us to ascertain whether or not the police advised the witnesses specifically whether they were prohibited from discussing their experiences in the lineup after they had completed the lineup procedure and had departed from the police station.

[6] The dissent somehow claims that Blakely was unsure about her identification of Gregory-Bey. *Post* at 9. The trier of fact obviously believed that any supposed equivocation on Blakely's part in identifying Gregory-Bey was attributable more to aggressive questioning by defense counsel than by actual confusion on Blakely's part about who had perpetrated the robbery and murder, given the impressive amount of evidence demonstrating the reliability of Blakely's identification (shaking upon seeing the clear photo of the defendant, her immediate selection of him at the lineup, etc.).

overheard Grinter and Graham whispering to each other, contrary to the instructions to refrain from talking, and heard them saying that they were scared to pick the perpetrator, for fear of being identified. Graham also testified that she had "whispered [to Grinter] in the conference room" *after the lineup* procedure was completed about who was in the lineup and that Graham told Grinter that she "thought it was number five." Additionally, Graham remarked that Grinter had whispered that she believed the suspect was "number three." Grinter, however, testified that this exchange took place when the witnesses were riding home together in the company of each other after the identification lineup procedure, and not in the conference room at the police station. In any event, because of their respective fears that the suspect could see them through the glass, neither Grinter nor Graham marked their identification forms while viewing the lineup.[7] Next, Hampton and Meads viewed the lineup, and neither of them made a positive identification of Gregory-Bey at that time. Hampton, repeating the same fear expressed by Grinter and Graham that she could be seen through the glass, refused to give the police a positive identification.

Shortly after the lineup, Graham, Grinter, and Hampton made contact with the police and informed them that they had seen one of the robbers in the lineup, but were afraid to select him because they were fearful that he might have been able to see them as they made their identifications.[8] Shortly thereafter, the police arranged for Grinter, Graham, and Hampton to view a videotape of the lineup

---

[7] Graham testified that at the lineup, Gregory-Bey's hair was combed; in the photo array, his hair was braided; and during the robbery, the perpetrator's hair was "wild." (R. at 1161.)

[8] According to Graham, the police never informed the witnesses that the suspects on display in the police lineup would not be able to see them.

at another identification procedure and once again Gregory-Bey's counsel was present during the witnesses' viewing of the videotape. All three witnesses were deposed by defense counsel immediately after viewing the videotape lineup and each one of them positively identified Gregory-Bey as one of the perpetrators of the robbery and murder.

### B.

Based on these positive identifications (from the photographic array, the live lineup, and the videotape lineup) made by witnesses Blakely, Grinter, Graham, and Hampton, Gregory-Bey was charged with murder (Ind. Code Ann. § 35-42-1-1), felony murder (Ind. Code Ann. § 35-42-1-1), conspiracy to commit robbery (Ind. Ann. Code § 35-41-5-2), robbery (Ind. Code Ann. § 35-41-5-1), criminal confinement (six counts) (Ind. Code Ann. § 35-42-3-3), and carrying a handgun without a license (Ind. Code Ann. § 35-47-2-1).[9] Before trial, Gregory-Bey moved to suppress the identifications by Blakely, Hampton, Grinter, and Graham, on the grounds that the police identification procedures were "inappropriate and lead [sic] to a suggestive identification." Gregory-Bey argued that the police had influenced the victims' identifications by "repeatedly present[ing]" his picture and that the witnesses had "conferred" in making their identifications at the physical lineup.

On October 1 and November 17, 1986, the trial judge conducted an extensive hearing (350 pages of testimony) outside the presence of the jury before ruling on Gregory-

---

[9] During the long and thorough investigation prior to the arrest of Gregory-Bey, two other suspects were at one time charged with the McDonald's robbery and Bible's murder. Neither of them was ever brought to trial due to what the prosecutors stated was a lack of sufficient evidence. Thus, Gregory-Bey was the only person charged and subsequently convicted for the crimes.

Bey's motion to suppress. During the hearing, defense counsel vigorously questioned the victim witnesses as well as detectives Jackson and Combs about the investigative procedures the police employed. The defense focused on the composition of the various photographic arrays, the allegedly suggestive comments Jackson made before showing the witnesses the photos, Jackson's supposed expression of "happ[iness]" after a positive identification, the purported improprieties that occurred during the physical lineup, and the witnesses' failure to positively identify Gregory-Bey earlier in the course of the investigation. Defense counsel was allowed to introduce in evidence before the jury the composite sketch, transcripts of the witnesses' statements on the day of the crime, the police bulletin issued on the day of the crime that provided a description of the two suspects, and the videotape of the physical lineup. The state trial judge, after reviewing all of these exhibits and testimony submitted on behalf of the defendant, refused to suppress the witness identifications.

At trial, all four of the witnesses (Blakely, Grinter, Graham, and Hampton) identified Gregory-Bey in open court for a third time as one of the perpetrators of the crimes. Once again defense counsel was given another opportunity to thoroughly and exhaustively question the victim witnesses regarding their failure to identify Gregory-Bey from the initial (poor quality) photographic arrays, any alleged improper suggestions made by the police during their viewing of the same arrays, and any alleged improper communication among the witnesses during and after the lineups.[10] Each one of the four witnesses _unequivocally and emphatically_ stated at trial that she was

---

[10] In addition, the defense counsel had ample opportunity to attempt to undermine the reliability of the witnesses' identifications of Gregory-Bey.

certain that Gregory-Bey was one of the perpetrators of the heinous murder and robbery at the McDonald's restaurant and furthermore that the police officers had not influenced their identification. The Marion County, Indiana, jury—after reviewing all of the testimony and exhibits introduced—found the testimony of the lay witnesses—as well as that of the police officers—not only credible, but also reliable and convincing, and returned a verdict of guilty on all counts. The defendant was sentenced to an aggregate term of 281 years in prison.

### C.

The day after his 1986 conviction, Gregory-Bey filed a praecipe requesting that a transcript be prepared in order that he might proceed with his appeal process. Some eight years later, in 1994, neither his trial counsel nor his successor counsel (appointed in 1992) had so much as filed an appellate brief on Gregory-Bey's behalf. Gregory-Bey then turned to the federal courts for relief, filing a petition under 28 U.S.C. § 2254 alleging that there had been an inordinate delay in his state court appeal process and seeking habeas corpus relief on his claim of improper witness identifications. We will not review the entire history of Gregory-Bey's attempt to get the Indiana Supreme Court to review his claim as that history is adequately set forth in our 1996 opinion, reflecting our decision holding that the nearly 10-year delay in resolving Gregory-Bey's direct appeal in the state courts had deprived him of his right to a timely appellate review in the state court system. *Gregory-Bey v. Hanks*, 91 F.3d 146, 1996 WL 394011, *2-3 (7th Cir. July 11, 1996) (Cummings, J.). In so ruling, we concluded that Gregory-Bey, because of the poor lawyering on the part of his appointed counsel and the failure to timely proceed with his appeal, be excused from the requirement that he must exhaust his state court

remedies before seeking habeas corpus review in a federal court.[11] *Id.* On remand, the federal district court (Judge Hamilton) addressed Gregory-Bey's claim that the witness identifications were unreliable on the merits. The trial judge found, after the hearing, that although some of the pre-trial identification procedures were unduly suggestive (but only with regard to witnesses Graham and Grinter), all of the other identifications were "nonetheless reliable," *Gregory-Bey v. Hanks*, 2000 WL 1909642, at *17-18, and also that Graham's and Grinter's in-court identifications had not been tainted by the improper pre-trial procedures. *Id.* at *18-20. Hence, no relief was warranted. *Id.* at *28.

## II.  Issues

On appeal, Gregory-Bey repeats the same issues he presented to the federal district court—that the state trial court's decision to allow the in-court witness identifications denied him due process because they were unreliable and the product of unduly suggestive investigative procedures. Gregory-Bey argues that the identifications were unreliable for three primary reasons: (1) "the witnesses failed to identify photographs of [Gregory-Bey] . . . on multiple occasions"; (2) the police allegedly improperly reinforced the witnesses' selection of Gregory-Bey from the photographic arrays after the witnesses had made their identifications; and (3) the witnesses, at several stages of the investigation, allegedly collaborated with each other and discussed who the perpetrator might be.

---

[11] Although we suggested that "when the Indiana Court of Appeals renders its decision . . . Gregory-Bey's delay [will] be ended," the state failed to petition for rehearing when the Indiana Supreme Court denied his direct appeal eight days after we remanded his § 2254 petition to the district court for consideration on the merits.

### III. Analysis

### A.

Gregory-Bey filed this § 2254 petition in the district court for the Southern District of Indiana in June 1994, almost two years prior to AEDPA's effective date. Because the amendments to the habeas corpus statute contained in that Act therefore do not apply, we analyze Gregory-Bey's due process claims under the law then in effect. *See Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Prior to AEDPA, federal courts disregarded the state court's legal conclusions and reached independent judgments on the issues presented, but deferred to the state court's findings of fact. *Koo v. McBride*, 124 F.3d 869, 872 (7th Cir. 1997). In pre-AEDPA cases, when federal courts review mixed questions of law and fact, federal courts may give different weight to the facts as found by the state court and thus reach a different conclusion in light of the legal standard. *Montgomery v. Greer*, 956 F.2d 677, 680 (7th Cir. 1992). Further, under pre-AEDPA standards, a § 2254 petitioner is entitled to plenary review of his claims. *Agnew v. Leibach*, 250 F.3d 1123, 1129 (7th Cir. 2001).

### B.

Prior to reaching the merits of a constitutional claim raised in a habeas corpus petition, we must initially determine whether the defendant-appellant has procedurally defaulted his claim that the state's witness identification procedures violated his right to due process of law. We must ensure that the habeas corpus petitioner has overcome two procedural hurdles, exhaustion and procedural default, before reaching the merits of his claim. *Spreitzer v. Schomig*, 219 F.3d 639, 644 (7th Cir. 2000). The failure to raise an issue on direct appeal (as did Gregory-Bey's appellate counsel in his failure to raise the witness identification issue in the first appeal to the Indiana

Supreme Court) will generally bar a defendant from raising it later in a post-conviction proceeding. *Menzer v. United States*, 200 F.3d 1000, 1005 (7th Cir. 2000); *Kurzawa v. Jordan*, 146 F.3d 435, 441 (7th Cir. 1998). The requirement that state courts should have the first opportunity to cure a claim of continued confinement stems from, *inter alia*, the belief that those courts are in the best position to correct their own errors, from the understanding that state courts are equally obligated to follow federal law, and from the desire for comity between state and federal court systems. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1998); *Kurzawa*, 146 F.3d at 440.

As a procedural default is not jurisdictional, any argument that Gregory-Bey has defaulted his due process claim can be waived by the government. *Hernandez v. Cowan*, 200 F.3d 995, 997 (7th Cir. 2000); *Nichols v. United States*, 75 F.3d 1137, 1145 n.17 (7th Cir. 1996). We refuse to penalize the defendant-appellant Gregory-Bey under this unique sequence of events that led to his direct appeal being delayed for nearly ten years. The state has waived any argument that he has procedurally defaulted his due process claims. Through no fault of the petitioner, by the time Gregory-Bey finally was able to appeal the merits of his habeas corpus petition to this court, more than fifteen years had elapsed since the date of his conviction.

Throughout the history of Gregory-Bey's attempts to have the state court examine the merits of his allegation that the witness identification procedures were flawed, Gregory-Bey's basic constitutional right of appellate review was delayed for reasons beyond his control. Initially, Gregory-Bey attempted to secure review in the Indiana court system immediately following his 1986 conviction with the filing of a praecipe to commence the appellate process in the state court. Inexplicably, and despite numerous written inquiries by the petitioner Gregory-Bey re-

garding the status of his appeal, his attorneys (both his original and successor attorney appointed in 1992) failed miserably, neglecting to file an appellate brief on his behalf until 1994. Second, Gregory-Bey did not sit idly by while his attorneys frittered away his opportunity to appeal. He repeatedly attempted—to no avail—to communicate and correspond with his appointed counsel. Eight years after his conviction, without so much as one single appellate brief being filed in the state courts on his behalf, the petitioner Gregory-Bey was forced to turn to the federal courts on his own and sought habeas corpus relief. We should also point out that in 1996, Gregory-Bey filed a motion with the Indiana Supreme Court *pro se* requesting that he be allowed to "withdraw and amend" the brief filed by his attorney because it failed to raise the issue of the propriety of the witness identifications. Unfortunately, the Indiana Supreme Court also declined to address Gregory-Bey's concerns and swept aside the problem raised in his *pro se* motion, for reasons unexplained, just as it had done in protecting his attorneys' tardiness in pressing his appeal.[12] In short, the state

---

[12] We recognize that normally the assertion of the right to representation constitutes a de facto waiver of the right to proceed pro se. *See United States v. Johnson*, 223 F.3d 665, 668 (7th Cir. 2000). In this case, however, Gregory-Bey's attorneys had failed to even file a brief in his direct appeal for more than eight years. When a brief was finally filed (*eight years after his conviction*), Gregory-Bey alerted the Court that he questioned the quality of the brief and stated that he believed the brief to be inadequate and that he would like to raise additional issues. Given the less than lawyer-like conduct and performance of his counsel, the Indiana Supreme Court should have been alerted by his motion that his counsel's performance was deficient not just in her timeliness, but also in her review and presentation of Gregory-Bey's case. Further, Gregory-Bey's initial counsel

(continued...)

exceeded the limits of the procedural default doctrine. As procedural default provides the state with the opportunity to correct its own errors, we think that given Gregory-Bey's repeated efforts to place the factual and legal basis of his claim before the Indiana Supreme Court and the Indiana Supreme Court's inability or unexplained refusal to provide Gregory-Bey with any reasonably timely appellate review, we refuse to sandbag the appellant and hold that the state has waived the right to make any argument that he procedurally defaulted the issues raised in his § 2254 petition. Thus we address the merits of Gregory-Bey's petition.

## C.

Eyewitness identification testimony can violate a defendant's constitutional right to due process of law when it creates a "'substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000). In determining the constitutionality of an identification procedure, we undertake a two-step analysis. *McGowan v. Miller*, 109 F.3d 1169, 1173 (7th Cir. 1997). As an initial matter, the petitioner must demonstrate that the identification procedures were unduly suggestive. *United States v. Traeger*, 289 F.3d 461, 473-74 (7th Cir. 2002); *United States v. Harris*, 281 F.3d 667, 670 (2002). If the petitioner successfully demonstrates that the challenged

---

[12] (...continued)
raised the witness identification issue in a 1990 motion to correct errors before the state trial court. Throughout the history of his appeal, Gregory-Bey corresponded with appellate counsel and urged her—without success—to press the witness identification issue.

procedure was unduly suggestive, the court must then determine, under the "totality of the circumstances," whether the identification was sufficiently reliable to prevent misidentification. *Traeger*, 289 F.3d at 473-74; *Harris*, 281 F.3d at 670. In assessing the reliability of an identification procedure, the courts consider the following factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

Under the first prong of the *Biggers* test, Gregory-Bey must establish that the witness identification procedures employed by the police were unduly suggestive. Gregory-Bey claims that the police tainted the identification procedure when they allegedly singled him out by repeatedly showing the witnesses his picture along with a number of other pictures in photo arrays. Next, he alleges that the police improperly reinforced Grinter's identification by informing her that another witness had selected the same suspect in the photo array. Finally, Gregory-Bey claims that the identification procedures were tainted because several times during the investigation stage of the proceedings, the witnesses supposedly collaborated with each other when making their identification known to the authorities. We address the nature of the alleged suggestiveness of each procedure in turn.

The Supreme Court has warned that showing witnesses a photograph of the same person several times may increase the risk of misidentification. *Simmons v. United States*, 390 U.S. 377, 383-85 (1968); *see also Kubat*

*v. Thierret*, 867 F.2d 351, 358 (7th Cir. 1989). The danger to be avoided in identification procedures is that of *orchestrating* the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that "this is the man." *See Foster v. California*, 394 U.S. 440, 442-43 (1969). We have held previously that there is nothing *per se* unconstitutional about showing witnesses the photograph of a particular suspect multiple times as part of an array. *See, e.g.*, *Harris*, 281 F.3d at 670;[13] *Stewart v. Duckworth*, 93 F.3d 262, 265-66 (7th Cir. 1996); *United States v. Donaldson*, 978 F.2d 381, 386-87 (7th Cir. 1992); *Kubat*, 867 F.2d at 358.

Gregory-Bey goes on to argue that the display and record procedures employed by the police detectives were defective. For example, although the police displayed several photographic arrays to the witnesses, they failed to specifically document how often the witnesses were shown the particular photographic arrays and which other pictures were included with the defendant's in each of the arrays. The defense also points out that Grinter stated the police let her know that another witness had identified a suspect from within the same set of photos before she was shown the stack of photographs, and that Graham noted that the police appeared "kind of happy" after she identified Gregory-Bey's photograph.

In the case before us, the evidence establishes that the displays of Gregory-Bey's photograph on more than one instance, along with several other suspects in each

---

[13] In *Harris*, this Court stated: "[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures." It is interesting to note that the author of the dissent in the case before us was on the panel that decided *Harris*, voted to affirm Harris' conviction, and registered no objection to the language cited herein.

of the arrays presented, cannot be classified as unduly suggestive, for it is abundantly clear from the testimony in the record that the colored photograph of Gregory-Bey that the witnesses identified (which revealed in detail for the first time his features such as facial hair or acne scars) was distinctly unique and different from the other, darker color photograph included in an earlier array (which failed to display any features such as facial hair or acne scars).[14] In *Stewart* we concluded that showing a witness photos of the same suspect three separate times along with other pictures did not render the identification unduly suggestive because the photos were markedly separate, distinct, and different. *Stewart*, 93 F.3d at 265-66 (noting, *inter alia*, that the defendant's photo "did not stand out in the arrays"). It is evident from our review of the evidence that because the photographs of the defendant used in the photographic arrays (from the first set of black and white photos to the second and third set of color photos) were so markedly unique and different from each other, we are convinced that the photographic lineup referred to was not unduly suggestive and thus did

---

[14] The dissenting opinion posits that the absence of the original black and white photo from the record before us renders us powerless to come to any conclusion as to "the difference, if any, between the black and white and color photos . . . ." *Post* at 3. This argument ignores the fact that the district court had before it *trial testimony directly on this point—from the police officers and from witnesses*—that even though the black and white photo depicted the same subject as the color photo, the black and white photo was of such inferior quality that it very well may be most accurately described as "markedly different." The dissent grants as much, noting that only one of the four eyewitnesses was able to recognize the perpetrator, and then only "tentatively,"*post* at 4, whereas all four were able to make certain—even emphatic—identifications upon viewing the high quality color photo (Exhibit 4).

not violate Gregory-Bey's due process rights.[15] *See id.*; *Donaldson*, 978 F.2d at 386-87; *Kubat*, 867 F.2d at 358.

Gregory-Bey next argues that the identification procedures were unduly suggestive because police officers allegedly reinforced both Graham and Grinter's identification of Gregory-Bey's picture *after they had selected his picture from the photographic lineup*. Initially, Gregory-Bey complains that it was unnecessarily suggestive for Sergeant Jackson to tell Grinter <u>before</u> she viewed the photos that another witness had positively identified a suspect from within a stack of over two dozen (24) other photos she was about to examine. But mere knowledge that another witness has selected a suspect from a photospread of pictures does not make the procedures unduly suggestive. *See McGowan v. Miller*, 109 F.3d 1168, 1174-75 (citing *United States v. Moskowitz*, 581 F.2d 14 (2d Cir. 1978) (holding that a witness's viewing of photographs of a six-person lineup, after being told that her original

---

[15] The dissenting opinion rightly notes the confusing nature of some of the eyewitnesses' responses to questions about the photo arrays that were raised on cross-examination at their depositions, the suppression hearing, and at trial. *Post* at 3-4. As has been explained above, however, much of the confusion centers on which of the two *colored* photos the detectives showed the witnesses, not on the poor quality black and white photos used early in the investigation.

For instance, the colloquy between Gregory-Bey's counsel and witness Blakely to which the dissent refers, *post* at 3, n.3, concerned Exhibits 3A and 4. Exhibit 3A is the poor quality color photo with Gregory-Bey's face case in shadows that Detective Jackson testified he brought over to Blakely's house. (Tr. 5 at 1220; Tr. 2 at 416.) Exhibit 4 was the better quality color photo that Detective Combs brought to Blakely's house shortly thereafter. (Blakely Dep. at 72; Tr. 3 at 640; Tr. 3 at 686.) Exhibit 3A was of such inferior quality that at least one other witness (Graham) confused it for a black and white photo. (Tr. 3 at 619.)

choice was an FBI clerk and that the other two witnesses selected the "right" individual, was not unduly suggestive).

Gregory-Bey also argues that both Graham and Grinter testified that the officers appeared happy or excited *after their selection* of Gregory-Bey as being contained in the photographic lineup, thus improperly reinforcing their identifications. He goes on to argue that after the allegedly improper reinforcement, the witnesses were apt to retain in their memory the photographic image, rather than the image of the perpetrator they actually saw at their crime. Gregory-Bey is reaching out for any argument that might have even the slightest conceivable chance of success, but we refuse to conclude that the procedures employed by the police in displaying Gregory-Bey's picture with a number of other suspects were unduly suggestive.

An identification procedure is unduly suggestive when *it is so suggestive as to create a substantial likelihood of irreparable misidentification. See Moore*, 115 F.3d at 1360. Where the police subtly (or in some cases possibly even not so subtly) thrust upon the witness signals or clues that lead the witness to select a predetermined suspect, the identification procedure is not likely to provide an unbiased reflection of the witness's personal knowledge. *Foster*, 394 U.S. at 442-43. But we are convinced that in this factual situation this is not a case where the police, like a magician pushing the two of hearts upon an unwitting audience member asked to "pick a card," prodded the witnesses to select Gregory-Bey (and not some other suspect) from the photospread. Gregory-Bey has been unable to point out to us any example of evidence in the record that might even suggest that the police tipped the witnesses off to the fact that Gregory-Bey's picture was among the many photographs in the display. In the past we have held that procedures more suggestive than these fell short of rising to the level of a constitutional violation. For example, we held that a photographic lineup in which

the primary suspect's photograph was a mug-shot with a time-date stamp corresponding with the approximate time of the crime was not unduly suggestive. *Kubat*, 867 F.2d at 358-59. Similarly, we have found that a photograph of a suspect with visible ankle shackles was not unduly suggestive. *Traeger*, 289 F.3d at 473-74. We do not think that the fact that the police "seemed happy" <u>after</u> Graham and Grinter had selected Gregory-Bey from the stack of photos raises even an iota of concern that the police's "suggestion" might have caused an "irreparable misidentification."[16]

Finally, Gregory-Bey alleges that the identification procedures were unnecessarily suggestive because the witnesses collaborated in providing details for an artist's composite sketch rendering and because Graham and Grinter spoke with each other during the physical lineup (exchanging not only their fear that the suspects could see them, but also their suspicions regarding which of the men in the lineup had been the perpetrator of the crimes). Gregory-Bey has failed to point us to any case law, nor have we discovered any, to support his theory that witness collaboration in assisting an artist's production of composite sketches renders the procedure unduly suggestive. Indeed, the converse is more likely true. If witnesses collaborate and share their knowledge with the sketch artist, it is most evident and logical that the artist will be able to produce a more accurate and detailed sketch. *See United States v. Messina*, 507 F.2d 73, 76 (2d Cir. 1974).

---

[16] The cases cited by the dissent all involve police officers "*telling*" witnesses that their identifications were "correct." *Post* at 6. Here, we refuse to hold that vague statements about the officers' alleged expressions of "happiness" imperils the reliability of the identifications. Indeed, one witness (Graham) testified that the officers "<u>didn't say [I] picked out the right person . . . . They just was [sic] kind of happy . . . but I don't know what they were happy about</u>" (emphasis supplied).

The conversations between Graham and Grinter, during and after the physical lineup, merit discussion. Both Graham and Grinter reported that they were fearful that the suspect would be able to see them through the glass at the lineup and both agree that for this reason they were reluctant to identify the suspect because of fear and whispered about these fears during the lineup. Although the police instructed the witnesses to avoid "talk[ing] to each other about anything," we cannot see how the witnesses' sharing of fears that the suspect might be able to see them raises even a modicum of concern about the suggestiveness of the procedure, for it has absolutely nothing to do with the identification procedure itself.

There is conflicting testimony, however, from Graham and Grinter about when they spoke with each other concerning their opinions as to which of the persons in the lineup they believed to be the perpetrator. According to Graham, the two talked about their potential identifications at the police station, but only did so *after* the completion of the lineup. Grinter agreed and testified that the conversation took place *after* the execution of the lineup, and furthermore that it only occurred after the two witnesses *had completed the identification procedure and had departed from the police station*. It is not the role of an appellate court to second-guess the finders of fact because the cold pages of an appellate record do not allow us the opportunity to observe the verbal and nonverbal behavior of the witnesses, including their reactions and responses to the interrogatories, any confused or nervous speech patterns, their facial expressions, attitudes, tone of voice, eye contact, posture, fidgeting, perspiring, and body movements. *See United States v. Frykholm*, 267 F.3d 604, 612 (7th Cir. 2001); *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir. 1993). In this case, although the state trial judge failed to particularize and articulate the amount of weight he gave to the testimony of each of the

individual witnesses, it is clear that he believed and credited their statements that they were certain about their identifications and, more importantly, that their separate identifications had not been influenced by the police. Given the nature of the fear and anxiety that certainly was created by the trauma of being involved in the robbery and murder episode, it is less than surprising that the lay witnesses would be most fearful and thus reluctant to identify the suspect in that they were apprehensive about being identified by him, and it is more than plausible that their whispering had only the effect of encouraging each other to overcome their fears. We have observed before that cross-examination is "the greatest legal engine ever invented for the discovery of truth." *Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995). In this case, defense counsel was allowed to and given great latitude to exhaustively cross-examine the witnesses regarding their identifications, both before the judge during the suppression hearing and before the jury at trial, and in each instance failed to shake their positive identifications of the murderer/robber. Defense counsel had ample opportunity to test the knowledge, recollections, "perceptions, memory and bias of the witnesses, contemporaneously exposing weaknesses and adding perspective in order to lessen the hazards of undue mistake." *Id*. From our review of this case, we are convinced that the jury did have ample opportunity to observe and weigh the alleged but unproven suggestiveness of the identifications, and we find nothing in the record to prove otherwise. Accordingly, we are unconvinced that the whispering between Graham and Grinter concerning their fears could possibly rise to the level of being unduly suggestive.[17]

---

[17] The dissent cites a 1971 case from another circuit in which a post-lineup conference was found to have tainted the later in-court
(continued...)

Even if we were to believe that Graham's and Grinter's conversations about their fears during and after the physical lineup rendered the lineup an unnecessarily suggestive procedure, we would affirm the decision of the state court because Gregory-Bey has failed to establish that under the totality of the circumstances the in-court identifications of *each of the four witnesses* were unreliable because of the alleged suggestive procedure. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996). We bear in mind during this examination that "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 198. It is the *reliability* of identification evidence that primarily determines its admissibility. *Manson v. Braithwaite*, 432 U.S. 98, 113-14 (1977). As the Supreme Court has pointedly noted, "the only duty of a jury in cases in which identification evidence has been admitted will often be to assess the reliability of that evidence." *Watkins v. Sowders*, 449 U.S. 341, 347 (1981). Further, we note that "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testi-

---

[17] (...continued)

identifications of two of the three witnesses. *See post* at 7, citing *Montiero v. Picard*, 443 F.2d 311, 313 (1st Cir. 1971). The *Montiero* case, unlike the case before us, involved a police officer asking three witnesses, *one at a time and in the presence of each other*, who each thought the perpetrator was. It hardly needs stating that the facts of this case are not even remotely similar to the facts of the *Montiero* case. Nor does the majority believe that simply because the police used the same lineup in the video as the live lineup that the identifications are corrupt. This assertion, somehow leading the dissent to conclude both that "the procedures were unreasonable" and that they "created the substantial likelihood of irreparable misidentification" at best can be classified as mere speculation and is unsupported in our case law.

mony that has some questionable feature." *Abrams v. Barnett*, 121 F.3d 1036, 1042 (7th Cir. 1996) (citing *Manson v. Braithwaite*, 432 U.S. 98, 116 (1977)). Based on this record, we are confident that the jury diligently assumed their duty and obligation under the law and followed the court's instructions in dealing with the witness identification question and also when evaluating the reliability of the eyewitness testimony, and furthermore we see no reason to doubt their finding that the eyewitness testimony was reliable. *See United States v. Miller*, 276 F.3d 370, 375 (7th Cir. 2002) (holding that juries are presumed to follow their instructions).

As noted above, *Biggers* announced several factors to consider in assessing the reliability of an identification:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. In applying the factors announced in *Biggers*, we note that the factual situation before us points overwhelmingly towards the reliability of the eyewitness identifications. First, the witnesses had sufficient opportunity to observe the robbers with a fixed and heightened degree of attention. All four of the witnesses had ample time (five to ten minutes at the crime scene) to view the robbers as they committed their robbery and proceeded to herd them into the store's freezer. The witnesses testified that Gregory-Bey approached them and made clear their intention to rob the store, thus giving them ample time and opportunity to view his face and bodily features over the course of several minutes and from multiple angles during the course of robbery.

Neither of the robbers wore masks and the store was well lit. *See, e.g.*, *United States v. Clark*, 989 F.2d 1490, 1495-96 (7th Cir. 1993) (two-minute robbery during broad daylight gave witnesses the opportunity to obtain definite impression of the robber's appearance). Second, we emphasize that the witnesses were not casual observers to the crime, but direct eyewitness victims. *See Manson*, 432 U.S. at 115 (witness identifications are more reliable when the witnesses are not casual observers, but are instead victims of the crime); *United States v. Newman*, 144 F.3d 531, 536 (7th Cir. 1998) (same).

More importantly, <u>*four of t7he five surviving witnesses all provided what can best be classified as consistent and accurate descriptions of Gregory-Bey immediately after the crime*</u>. As we have pointed out *supra*, their descriptions were sufficient to allow the creation of a fairly accurate composite sketch, which in turn led to the police receiving a tip that Gregory-Bey was probably involved in the crimes. All four of the witnesses described Gregory-Bey as dark skinned. Three of the four (Graham, Grinter, and Hampton) described him as having an Afro that was either matted or uncombed. Hampton and Grinter described his build as tall (5'10" to 6'1") and slight (135 pounds). Lastly Hampton and Graham described Gregory-Bey as having a small beard or a little facial hair. All of these descriptions match Gregory-Bey's appearance. That the witnesses were able to provide such an accurate and detailed description of Gregory-Bey is a further indication of the reliability of their identifications.[18]

---

[18] That the victims of a recently committed violent crime initially provide descriptions that vary in some respects is not surprising, <u>*let alone fatal to their reliability*</u>. It is obvious that different people can and do react in different ways to the extreme stress oftentimes caused by a shocking event such as a robbery

(continued...)

But most telling is the degree of certainty the witnesses demonstrated at the time of identification. Kathryn Blakely testified that when she came to Gregory-Bey's picture she "kept starin[g] at the picture and . . . just started shakin[g]." Blakely was so certain that she had identified the correct suspect that she became so distraught and fearful that she began to cry. Graham reported a similar experience when she selected Gregory-Bey's photograph. Graham testified at the hearing on the motion *in limine* that she had "no trouble in picking him out" and was shaking so violently that she was unable to write her name.

This is not a case of a flimsy identification resting upon a foundation of quicksand, where a minor slip-up by the police during the investigation might have seriously undermined the confidence in the reliability of the identification. Instead, this is a case where prior to trial four witnesses had independently identified—not once, but twice—Gregory-Bey as one of the perpetrators of these heinous violent crimes, murder and armed robbery. Two of those witnesses (Blakely, the first witness to identify Gregory-Bey both from the photos and the lineup, and Hampton) made their *identifications completely independently of anyone and were entirely unaffected* by the al-

---

[18] (...continued)

and brutal murder. In an attempt to challenge the wealth of evidence concerning the identifications, the dissent focuses on alleged discrepancies in the initial description the victims gave to the police. Significantly, as noted *supra*, the test for reliability under *Biggers* includes not only the "accuracy of the witness' prior description[s] of the criminal," but "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

legedly suggestive procedures about which Gregory-Bey complains. All four witnesses expressed a great deal of confidence and certainty about their identifications. Although some of the initial detective work (identification procedures, unclear picture, and records thereof) might have been improved upon, it fell far short of creating a "substantial likelihood of irreparable misidentification." It is not our duty—as an appellate court—to nitpick the record to find possible error, but rather to search for the truth and the truth alone in the type of factual situation presented herein and render justice to the accused whether it be a finding of not guilty or guilty. The United States Constitution guarantees not a perfect trial, but only a fair one. *See United States v. Harris*, 271 F.3d 690, 704 (7th Cir. 2001). We have acted accordingly and confirmed the considered judgment of the jury made up of the defendant's peers.

Because we find the identification procedures were neither unduly suggestive nor so unreliable as to create a "substantial likelihood of irreparable misidentification," *see Traeger*, 289 F.3d at 473-74; *Biggers*, 409 U.S. at 198, Gregory-Bey's sentence and conviction are AFFIRMED.

WILLIAMS, *Circuit Judge*, dissenting. While I agree with the legal standard the majority uses to determine the reliability of the witnesses' identification of Lawrence Gregory-Bey, I disagree with its application of that standard. Based on the facts submitted, I believe that the identification procedures were unduly suggestive, making the identification of Bey by the four eyewitnesses,

Kathryn Blakely, Angela Grinter, Urhonda Graham, and Patrice Hampton, unreliable. Accordingly, I dissent.

\*\*\*

As the majority noted, we analyze whether the initial identification procedures were unduly suggestive and if so whether the undue suggestion impairs the reliability of the identification. *See United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998); *United States v. Duprey*, 895 F.2d 303, 307 (7th Cir. 1989). Our task is made particularly difficult in this case because the witnesses provided statements regarding the facts and circumstances surrounding their identifications to the police and in deposition, motion to suppress, and trial testimony, and some portions of these statements are inconsistent.

A. Unduly Suggestive

Identification procedures are unduly suggestive when the suggestiveness creates a "very substantial likelihood of irreparable misidentification." *See United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir. 1997) (internal quotation marks omitted). Bey challenges the identification procedures used during the photo array and lineups that form the basis of the witnesses' identification of him.

1. Photo arrays

As the majority notes, repeated showing of a suspect's picture in police photo arrays is not unduly suggestive if the photos do not resemble each other. *See Stewart v. Duckworth*, 93 F.3d 262, 265-66 (7th Cir. 1996) (after reviewing photos court ruled that the arrays were not unduly suggestive because the photos were dramatically different); *United States v. Donaldson*, 978 F.2d 381, 386-87 (7th Cir. 1992) (court held repeat showings not unduly

suggestive because the suspect's photos were distinctly different). This court normally determines the resemblance by comparing the pictures in each array. *Id.* at 387. In this case, the court was unable to compare the black and white photo and the color photos due to the unexplained absence of the black and white photo.[1] So the majority relies on the witnesses' testimony to decide if there was a dramatic difference between the photos. However, there are difficulties presented in this case because of the conflicting testimony of the witnesses regarding the differences between the black and white and color photos.[2] Given this conflicting testimony and the court's inability to compare the actual photographs, this court cannot determine the difference, if any, between the black and white and color photos of Bey and thus whether the repeated showing of Bey's picture was unduly suggestive.

Repeated showing of one suspect's picture increases the likelihood that the witness will choose the recurring picture not because it is the suspect, but because the witness remembers seeing the picture before. *See Simmons v.*

---

[1] "Q [ to Officer Jackson]. Do you have a copy of the black and white photo that was shown? A. I don't have a copy. . . . Q. No, I'm talking about the copy that was shown? A. No, I don't know what happened to it." Tr.2 at 409-10.

[2] During her deposition, Blakely said that the black and white photo and the color photo were not distinctively different. "Answer [Blakely deposition readback]; the picture in the folder, they was exactly alike except the picture in the folder had more color to it than the picture was black and white. Question; the other was what? Answer; black and white. Question; was black and white or just darker? Answer; it was, it didn't have any color to it. Question; but you still could tell the same facial features? Answer; yes. And you could still tell that it was the same picture and everything else? Answer; yes." Tr.5 at 1220-21.

*United States*, 390 U.S. 377, 383-84 (1968); *Kubat v. Thieret*, 867 F.2d 351, 358 (7th Cir. 1989). The likelihood that a witness will misidentify a suspect from repeated showings of the suspect's photo is lessened if the witness at least tentatively identifies the suspect in the first photo array, as was the case in *Kubat. See* 867 F.2d at 356. In this case, only one of the four eyewitnesses tentatively identified Bey from the black and white photo,[3] and she was still not completely certain that Bey was the robber upon viewing the color photos.[4] Because three of the witnesses were unable to even tentatively identify Bey from the black and white photo[5] and the only witness to

---

[3] "Q [to Hampton]. So what did you say when you picked that picture out? A. Well, I told him that this looked like him but I couldn't be sure because of the detail of the picture." Tr.3 at 581. "A [Hampton]. "And there was a black and white photo in there that looked like the guy but I couldn't uh, identify it because the picture wasn't clear enough. Q. Okay. Did you say something to Jackson or anybody about that? A. Yes I did. Q. What'd you say to them? A. I told them that uh, this looked like the guy but the picture's not clear." Tr.6 at 1283-84.

[4] "A [Officer Combs]. As I recall one (1) lady, Patrice Hampton, stated that she would uh, she felt 90% sure that was the man but she'd like to see him in person to see if that was him. She felt like once she seen him in person she'd know him." Tr.3 at 684-85.

[5] Blakely and Grinter testified at various points that they had tentatively identified Bey from the black and white photo. "A [Blakely]. It was uh, a black and white and it wasn't real clear. Q. Were you able to distinguish the features in that photo? A. Yes, 'cause I told my mother, I said that looks like the guy. And then she said, well if it is then call uh, Jackson back and let him know. But I didn't." Tr.5 at 1202. "Q [Grinter]. Okay. Was it a color photograph, the first one that you picked out that you said looked like it, looked like him? A. No. Q. It was uh, was it a black and white photograph? A. Yes." Tr.3 at 546. However, their testimony
(continued...)

do so expressed uncertainty upon viewing the color photos, the repeated showing of Bey's photo was unduly suggestive.

The likelihood of irreparable misidentification was further exacerbated by comments made by the police. Before picking Bey out of the photo array, the police told Grinter that another witness had picked a suspect out of the photos.[6] According to Grinter, the police then showed her a photo array in which Bey's photo was the only photo that had appeared in previous photo arrays.[7] Both Grinter and Graham claimed that when they chose

---

[5] (...continued)
is directly contradicted by other statements made by Blakely, Grinter, and Officer Jackson. "Q [Grinter]. Okay. Uh, what did that photograph look like? A. It was a black and white picture. Q. Okay. And what was the quality of that photo? A. It was too dark to see the features in his face. . . . Q. Did you, when you saw that photograph before did you identify it? A. No." Tr.5 at 1034. "Q [to Officer Jackson]. Okay. Was uh, so Lawrence Gregory's picture was included in this photo array of black and white pictures, is that correct? A. That's correct. Q. And uh, to your knowledge was uh, did either Patrice Hampton or Kathryn Blakely pick him out of that photo array? A. No, they did not." Tr.2 at 409; *see also* Blakely, Tr.3 at 636-39.

[6] "Q [Grinter deposition readback]. When you picked somebody out you told Mr. Alden that [Fred Jackson] had told you that once other people had picked somebody out of the group, is that right? Yes. Did he tell you that before or after you made your selection? Answer; before. Question; before? Answer; yes." Tr.3 at 548.

[7] "Q [to Grinter]. You ultimately picked the picture out that Detective Jackson showed you in this photo array, is that correct? A. Yes. Q. Had you seen any of the other individuals in this photo array in a group of pictures before? A. No. Q. Only Lawrence Gregory? A. Yes." Tr.5 at 1058.

Bey the police seemed excited,[8] and Grinter further asserted that the police indicated to her that Bey was the same person chosen by the other eyewitnesses.[9] These statements and expressions of the police before and after Grinter and Graham identified Bey as a suspect have been found by other circuits to be unduly suggestive. *See United States v. Smith*, 156 F.3d 1046, 1050 (10th Cir. 1998) (unduly suggestive for police to tell witnesses to assume the suspect was in the photo array); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (impermissibly suggestive to cause a witness to assume that suspect was in photo array); *Swicegood v. Alabama*, 577 F.2d 1322, 1326-29 (5th Cir. 1978) (ordering habeas relief in part because police told witnesses after lineup that they had identified "the suspect that we had"); *United States v. Jarvis*, 560 F.2d 494, 500 (2d Cir. 1977) (practice of telling witnesses whether identifications are "correct" or not, could so taint an identification as to require exclusion of evidence).

In sum, because the court cannot determine how similar Bey appeared in the photos used at each photo array,

---

[8] "Q [to Grinter]. After you made your selection was Detective Jackson, did he appear to be excited that you'd made the selection that you, that you'd made? A. Yes." Tr.3 at 549. "Question [Graham deposition readback]; when you picked him out what did they say to you when you picked him out? Answer; nothing. They was kind of happy like. . . . They just was kind of happy, you know, that I, like if I picked out the right person. They didn't say you picked out the right person, that's him. Question; did they give you the impression that you did pick out the right person then, obviously that you'd picked out. . . . Answer; in a way." Tr.5 at 1163-64.

[9] "Question [Grinter deposition readback]; did [Detective Jackson] indicate to you if that was the same person that the other girl picked out, he was happy to see you picked that person out? Answer; yes." Tr.3 at 550.

the witnesses were unable to identify Bey prior to view-
ing the color photo, and the police made suggestive com-
ments, I would hold that the photo array identification
procedures for all four of the eyewitnesses were unduly
suggestive.

2. Lineup

The lineup procedure employed by the police was
also unduly suggestive, for several reasons. First, while
waiting in the police conference room immediately after
viewing the live lineup, and also later that day, Graham
and Grinter discussed their potential identifications with
one another.[10] It was only after these conversations took
place that Graham and Grinter identified Bey during
a video lineup. Because they made positive identifica-
tions only after learning of each other's suspicions about
whether the robber was in the lineup, their identifica-
tions were tainted. *See Montiero v. Picard*, 443 F.2d 311,
313 (1st Cir. 1971) (finding certain identifications to be
"tainted" because the witnesses identified a suspect only
after hearing another witness identify that suspect).

Second, Grinter said that before Blakely went to the
lineup, she told Blakely that everyone had picked the

---

[10] "A [Grinter]. We were uh, we were going home and we asked
each other if we had picked anyone out of the line-up. Q. Uh hum.
A. I said no. She said no. Uh, and her mother, Louella Spurling
asked us did we see the person up there. And we said yes. And she
said that we should of uh, marked the sheet." Tr.5 at 1043. "Q [to
Graham]. Alright. The two (2) of you whispered in the conference
room about. . . A. Um hum. Q. . . who was in the line-up, is that
right? A. Um hum. Q. Alright. And did you tell Angie that
you thought it was number five (5)? A. Um hum." Tr.3 at 622.

same suspect out of the photo array.[11] Grinter's comments to Blakely prior to the live lineup probably suggested to Blakely that she should look for the person in the photo instead of making an independent identification, creating the substantial likelihood of irreparable misidentification.

Third, the identification of Bey by Hampton in the video lineup was unduly suggestive because the police used the same lineup in the video as the live lineup.[12] This is problematic because of the possibility that the witnesses would discuss the live lineup before they were brought in to view the video lineup in the same way they discussed the photo array before attending the live lineup. Thus, the live and video lineups were unduly suggestive for the four eyewitnesses because the procedures were not reasonable and created the substantial likelihood of irreparable misidentification.

## B. Reliability of Identification

Applying the five factors announced in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), I find that each of the four

---

[11] "Q [Grinter deposition readback]. So when you were notified about going to the line-up did you have a conversation with anyone? Did you have a conversation with Urhonda, Patrice, Sonia or Kathryn about the fact you were going to a line-up? Answer; just that we were going down and if this guy really looked like the guy that robbed McDonald's. Question; okay, and you had then talked to them about the fact that certain ones had picked him out of the photo display and it was the same one that you all picked out, you compared notes about that already before the line-up, is that correct? Answer; yes." Tr.5 at 1064-65.

[12] "Q [to Hampton]. And what was that a video tape of? A. It was a video tape of the line-up? Q. Was it the exact same line-up that you'd seen uh, several weeks earlier? A. Right." Tr.6 at 1296.

eyewitnesses' identifications of Bey was unreliable because of their lack of certainty that Bey was the robber.

In her first statement to the police, Blakely failed to describe any specific characteristics of the suspect beyond the fact that he was tall, skinny, and had dark skin. Tr.2 at 381 (Defendant's Exhibit C). In fact, Detective Jackson testified that within ten days of the robbery, Blakely intimated that a different dark-skinned man was the robber.[13] In addition, the level of certainty Blakely expressed when identifying Bey is troubling. Blakely was shown Bey's picture several times before she could identify Bey.[14] Blakely reasons that she did not identify Bey earlier because she was tired of the detective showing her the photos and wanted him to leave.[15] This explanation severely undercuts the reliability of Blakely's dramatic re-

[13] "Q [to Officer Jackson]: Let me ask you this question; prior to December of 1985, as a matter of fact within ten (10) days after November the 17th, did Kathryn Blakely indicate to you that she thought she saw one uh, or someone who looked uh, the perpetrator of the robbery in a food stamp store in Indianapolis? A. Yes." Tr.2 at 421.

[14] "Q [to Blakely]. Now before that time you had seen the black and white photograph, is that correct? A. Just uh, yeah. Q. The last time that the photographs were brought to you, you had seen the photograph of this same individual. A. Yes." Tr.3 at 641.

[15] "Q [Blakely deposition readback]. He said, I just got to talking to Jackson and Jackson said he showed you this same picture. Did you know? I said, yeah I seen it. He said, well why didn't you tell Jackson. I said, because I wasn't really, I was just mad at him and was just really, I wasn't paying no attention to him. I started at it and then I had a reaction and I just put it under the bottom and just gave them to him so he could go and hurry up and leave." Tr.5 at 1219-20.

action to Bey's color picture[16] and the certainty of her identification.

Furthermore, Blakely testified at trial that when she identified Bey from the photo array more than three months after the robbery, she was certain Bey was the assailant.[17] Notwithstanding this certainty, Blakely further testified that when she identified Bey at the lineup four months after the robbery,[18] she thought that he was not the same man she had just picked out of the photo array.[19] Moreover, when Blakely picked Bey out of the lineup she was not "100% sure" that Bey was the robber, but certain that Bey "looked exactly like [the robber]." Tr.5 at 1228. Because Blakely initially identified someone else as a suspect nearly two weeks after the robbery, believed that the person she picked at the lineup was different from the person she picked out of the photo array, and was uncertain whether Bey was the robber, her prior identifications and her identification at trial were unreliable.

Grinter's identification was no more reliable than Blakely's identification. First of all, it is questionable

---

[16] Blakely began to shake as soon as she saw Bey's picture. "A [Blakely]. And then I started shaking and I told Combs, I said, this is the guy." Tr.3 at 641.

[17] "A [Blakely]. And [Officer Combs] said are you sure. And I said yes I'm sure." Tr.3 at 641.

[18] Blakely only participated in the live lineup in which Bey was present. Grinter, Graham and Hampton participated in the live lineup and the video lineup.

[19] "Q [to Blakely]. Now Kathryn when you made the identification of the line-up how'd you feel about that? What, let me rephrase my question. Uh, did you recognize the person in the line-up that you picked as the person whose photograph you had picked? A. No. Q. Okay. Did you think you were picking someone different? A. Yes." Tr.5 at 1207.

whether Grinter had ample time to view the suspect at the time of the crime because she testified that she was afraid to look at him directly.[20] However, assuming that she did have an opportunity to view the suspect and paid attention to him, Grinter still failed to accurately describe Bey in her first statement. Specifically, Grinter failed to mention that the suspect had bumps on his face, a mustache, and a beard. Tr.2 at 388 (Defendant's Exhibit E). In fact, at her deposition and at the motion to suppress hearing, she testified that the suspect did not have any scars or bumps on his face.[21] Thus, her early descriptions of the suspect were not accurate. When she finally identified Bey more than three months after the robbery and after looking at photos at least three different times, *see* Tr.3 at 543-44, Tr.5 at 1056-57, she was certain that it was Bey.[22] Nevertheless, Grinter was not so certain that Bey was the robber when she later went to the live lineup because she did not pick Bey[23] and admitted to Graham that she thought it was someone other than Bey.[24]

---

[20] "Q [to Grinter]. And were you sort of afraid to look at, look at them directly? A. Yes." Tr.3 at 535.

[21] "Q [to Grinter]. Did he have any scars? A. Not that I remember." Tr.3 at 538. "Q [Grinter deposition readback]. Okay, were there any scars or birthmarks or any other features on the face you recognized? Answer; no." Tr.3 at 540.

[22] "A [Grinter]. The next time I was sure it was him. Q. The next time you were sure that was who? A. The dark skinned man that robbed McDonald's." Tr.3 at 545.

[23] "Q [to Grinter]. And did you pick anybody out of the line-up? A. No." Tr.3 at 551.

[24] "Q [to Graham]. And did [Grinter] tell you who she thought it was? A. She, no she didn't. Not that I remember. Q. What's, did you ever tell me that you thought that she told you it was number three (3)? A. Yeah, I think so. Q. Okay. So you remember her
(continued...)

It was only after Graham said in Grinter's presence that she believed that the suspect was number five, Bey, that Grinter identified Bey in the video lineup.[25] Therefore, Grinter's identification of Bey in the photo array, lineup, and at trial was unreliable.

Graham's identification of Bey was also unreliable. Graham had ample time to view the suspect, she paid attention to the suspect, and her first description matched Bey.[26] However, Graham's description of Bey changed over time. Graham later said that the suspect did not have a beard or mustache,[27] but these characteristics were included in her first statement. Furthermore, although Graham finally identified Bey more than three months after the incident and after viewing photos at least three

---

[24] (...continued)
telling you that she thought it was number three (3) that was in the line-up? A. Uh huh." Tr.3 at 622.

[25] "Q [Grinter deposition readback]. Did [Graham] ever say to you she knew it was number so-and-so, did she ever say to her mother out loud she knew it was so-and-so, number five (5)? Answer; she told her mother. Question; that she knew it was number five (5)? Answer; yes." Tr.5 at 1069. "Q [to Louella Spurling, Graham's mother]. Do you remember which number [Graham] said? A. Yes, she said number five (5). And then Angela Grinter said number five (5) also." Tr.5 at 1174.

[26] "A [Graham]. His face was narrow and he had like a little beard like he was trying to shave and he had little bumps underneath here not that many but a little and a little beard and a little mustache. . . . A. He had you know like some scars he had from when he was little and they was just still in his face." Tr.2 at 385 (Defendant's Exhibit D); *see also* Tr.3 at 608.

[27] "Q [Graham deposition readback]. [T]here's no question in your mind that uh, he had no facial hair at that time? A. Not to me he didn't." Tr.5 at 1155.

different times,[28] she did not pick Bey when she later went to the live line-up.[29] She claims that she was scared,[30] but she also testified that she did not pick Bey because his hair looked different.[31] Because of Graham's indecisiveness in her description and identification of Bey, Graham's prior identifications and her identification at trial were not reliable.

Finally, Hampton's identification of Bey was unreliable. Hampton had ample time to view the suspect at the time of the crime, and there is no question that she paid attention to the suspect at the time of the crime. Tr.3 at 563-71. Yet, her first statement failed to mention that the suspect had bumps on his face and a mustache.[32] When she officially identified Bey's photo, she had seen his picture

---

[28] "A [Graham]. I didn't, I didn't think it was him so I didn't uh, I didn't see him. Q. Okay. And uh, then after that did you have a occasion to view photographs any other time. A. At home and at work." Tr.3 at 611; *see also* Tr.5 at 1118-20.

[29] "Q [to Graham]. Did any, but you didn't pick anybody out? A. Um hum." Tr.3 at 629.

[30] "A [Graham]. Why I didn't pick him out after I had told them it was him in Steve Goldsmith's office and then they said why come I didn't pick him out and I told them because I was scared." Tr.3 at 630.

[31] "Q [to Graham]. So did any of the detectives say anything to you about how could you pick him out of the photo array but not pick him out of the line-up? A. He, he looked different. His hair did." Tr.3 at 629.

[32] "Q [to Hampton]. Okay uh did he have a mustache? A. No he had facial hairs. Q. Facial hairs? A. Beard hairs. . . . Q. Any scars unusual on his face? A. No I didn't see any. Q. Okay anything that you can think about that stood out about this guy? A. No but if you showed me a picture of em I bet you I could point him out." Tr.2 at 373 (Defendant's Exhibit A).

three times,[33] and she was not completely certain that it was Bey. Hampton requested to see Bey in person before she could be certain.[34]

At the lineup Hampton failed to pick Bey[35] and lied about it to the police.[36] She did not change her story until she heard that someone had identified Bey as the suspect.[37] Hampton then called the police and said that she failed to identify the suspect because she was scared.[38] Additionally, Hampton discussed the suspect with Grinter before the video lineup, although they claim that they

---

[33] "Q [to Hampton]. Okay. So you saw the picture that you ultimately picked out three (3) different times. . . . A. Right." Tr.3 at 585.

[34] *See supra* note 4.

[35] "Q [to Hampton]. Did [Mr. Goldsmith] ask you if the person involved in the robbery was in the line-up? A. Yes. Q. What did you tell him? A. I told him no." Tr.3 at 589.

[36] "A [Hampton]. He told, he asked me did I uh, he asked me could I identify one of the guys. And I told him no. Q. So what, why did uh, was that true? A. Was it true that I could or couldn't? Q. Well, you told him that you couldn't, right? A. Right. Q. Was that true? A. No." Tr.6 at 1293.

[37] "A [Hampton]. So then it wasn't until the next day that you contacted Detective Jackson and said that you did, in fact, know somebody in the line-up? A. Yes. Q. But at that point in time you knew Urhonda and Angie had not picked him out and they . . . A. No, at that time I didn't because all I knew at that time is that one (1) of the girls picked out one (1) of the guys. And, one (1) of the guys I do not know which one they picked out. So, I couldn't even answer that for you." *See* Hampton dep., 6j, at 48.

[38] "A [Hampton]. And when I called Dave Cook I had to explain to him everything that, you know, that I was scared to pick him out and the reason why and everything." Tr.3 at 590.

did not discuss whom they picked.[39] Hampton's uncertainty and subsequent conversations with the police and Grinter before the video lineup make Hampton's identification of Bey unreliable.

For the reasons stated above, I would reverse Bey's conviction.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[39] "Q [Hampton deposition readback]. So then the next day you and Angie had a conversation about who it was that picked him out, right? Answer; it wasn't a very long conversation." Tr.3 at 603.